SHELL OIL COMPANY,
Plaintiff-Appellee,

v.

FEDERAL ENERGY ADMINISTRATION, an agency of the United States, and John F. O'Leary, Administrator, Federal Energy Administration, Defendants-Appellants.

No. 3–12.

Temporary Emergency Court of Appeals.

Argued Jan. 24, 1978.

Decided April 5, 1978.

Peter Buscemi, with whom Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, and Scott H. Lang and Nancy C. Crisman, Dept. of Energy, Washington, D. C., of counsel, were on the brief for defendants-appellants.

William E. Wickens, Washington, D. C., with whom William Simon and Frederick S. Frei, Howrey & Simon, Washington, D. C., Richard J. Abrams, Richards, Layton & Finger, Wilmington, Del., and William G. Winters, Jr. and Albert D. Bowers, Houston, Tex., of counsel, were on the brief for plaintiff-appellee.

Before ANDERSON, BECKER and BONSAL, Judges.

BONSAL, Judge:

This is an appeal from the United States District Court for the District of Delaware. Shell Oil Company ("Shell") brought this action seeking review of a Decision and Order of the Federal Energy Administration ("FEA"), which found Shell in violation of a pricing rule for unleaded gasoline, and ordered restitution for gasoline sales overcharges. The District Court granted summary judgment to Shell on the grounds that the pricing rule (hereinafter referred to as "the July regulation") was adopted in violation of the Federal Energy Administration Act ("FEAA") and was therefore void. We affirm.

Shell contends, and the District Court agreed, that two basic rulemaking requirements under the FEAA were not met in the adoption of the July regulation. The Government concedes that one of the requirements was not met but argues that an opportunity for Shell to comment on a temporary rule (the June interim rule) promulgated prior to the July regulation permitted sufficient participation in the rulemaking process to preclude invalidation of the rule here.

In January of 1973, the Environmental Protection Agency ("EPA") published regulations requiring that on or before July 1, 1974 unleaded gasoline be made available to retail outlets selling more than 200,000 gallons per year. Belatedly aware of this in the spring of 1974 and there being no price regulations in effect, the Federal Energy

Office [1] ("FEO") hastily issued on May 29, 1974 an interim price rule for unleaded gasoline effective only for the month of June, 1974 ("June interim rule"), during which month the FEO could more accurately determine what the price rule should be. Accordingly, the preamble to the June interim rule invited comments for a rulemaking proceeding "as to what the final price rule for unleaded gasoline should be." (The June interim rule itself was held invalid for failure to meet the then applicable Administrative Procedure Act's ("APA") requirements of proper notice and opportunity to comment. *Consumers Union of United States, Inc. v. Sawhill*, 393 F.Supp. 639 (D.D.C.), *aff'd per curiam*, 523 F.2d 1404 (Em.App.1975).)

The June interim rule provided that the price of unleaded gas be calculated in reference to "the weighted average price at which premium grade gasoline was lawfully priced . . . on May 15, 1973." 39 Fed.Reg. 18638 (May 29, 1974). On June 10, 1974, Shell submitted comments to the June interim rule, indicating that the premium gas price formula was generally acceptable. Later in June, it came to Shell's attention that the FEO was considering a formula which would have calculated unleaded gas prices in reference to *regular* gas, instead of *premium* gas. In a letter to the FEO dated June 25, 1974, Shell objected to the regular gas formula and suggested a variable pricing system designed to permit oil companies to produce more than one grade of unleaded gasoline.

On July 1, 1974, the FEA [2] issued the July regulation which is the subject of this action. The July regulation determined unleaded gasoline prices by a new and not previously announced formula which provided that the price of unleaded gasoline be based on "the weighted average price at which leaded gasoline of the same or nearest octane number was lawfully priced . . . on May 15, 1973, plus 1 cent." 10 C.F.R. 212.112(b)(1).[3] Not only had there been no effective opportunity to comment on this formula, but the FEA did not request specific data "reflecting differences between leaded and unleaded refining costs" until after the July regulation was issued, when it invited additional comments, extending the comment period until July 22, 1974. (In December, 1976, based on information received after July, 1974, the FEA determined that the 1 cent increment did not "accurately reflect the special costs associated with the refining of unleaded gasoline" as the fixed increment was too low in some cases, too high in others. 41 Fed.Reg. 54775 (December 15, 1976).)[4]

On or about September 15, 1974, a "Notice of Probable Violation" was served on Shell by the FEA because it had been overcharging for unleaded gasoline owing to its misinterpretation of the July regulation.[5]

---

1. The FEO was the FEA's predecessor.

2. On June 27, 1974, the FEA was established pursuant to an enabling provision of the FEAA. Neither party disputes that the rulemaking procedures under the FEAA govern this action.

3. The rule was eventually made effective on July 10, 1974 because of the fact that it wasn't published until July 8, 1974.

4. However, because of the great disparity in comments received in the Dec. 1976 rulemaking proceeding, the FEA decided to retain the 1 cent increment. The validity of that resulting rule is not challenged here.

5. In construing the regulation, Shall had determined the nearest certified octane (Super Regular) as of June 30, 1974 (the day before unleaded gas was required to be introduced) and traced its price back to May 15, 1973. Shell had spoken with Mr. Maple, the FEA Director of Marketing and Industry Liaison, on July 16, 1974 and had obtained his approval for this interpretation—although this wasn't binding on the FEA. The FEA contended that the certified octane comparison as well as the price should have been made as of May 15, 1973. However, octane certification had not been initiated until August 1973 at which time the Cost of Living Council had imposed mandatory price controls on petroleum products under Phase IV of the Economic Stabilization Program. Whereas on June 30, 1974, the nearest certified octane number to that of unleaded gas was that of Super Regular, on May 15, 1973 it was that of regular (to which, it will be recalled, Shell objected as a basis for unleaded gas prices).

On October 16, 1974, Shell filed a reply to the FEA's notice, seeking its withdrawal.

On July 8, 1975, almost nine months later, the FEA served a "Remedial Order" upon Shell, ordering it to reduce its prices for unleaded gasoline in compliance with the July regulation and to make restitution to customers of unleaded gas between July 10, 1974 and July 8, 1975.[6]

On July 18, 1975 Shell appealed to the Office of Exceptions and Appeals of the FEA. On January 6, 1976, Shell's appeal was denied in a Decision and Order.[7]

Shell then brought this suit in the District Court on February 4, 1976, seeking to invalidate the July regulation and enjoin enforcement of the Order. The District Court granted summary judgment in favor of Shell on the grounds that the July regulation was adopted in violation of the FEAA and was therefore void. This appeal followed.

Shell contends that the July regulation failed to comply with two sections of the FEAA. The first section, 15 U.S.C. § 766(i)(1)(B), requires that an opportunity to comment be permitted for at least 10 days after a proposed rule is noticed in the Federal Register. That section provides:

"Notice of any proposed rule, regulation, or order . . . shall be given by publication of such proposed rule . . . in the Federal Register. In each case, a minimum of ten days following such publication shall be provided for opportunity to comment; except that the requirements of this paragraph as to time of notice and opportunity to comment may be waived where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation or order."

No finding requisite for a waiver of the notice and opportunity to comment was made. Shell contends that it was not afforded the opportunity to comment on the July regulation before it became effective.

The other section, 15 U.S.C. § 766(i)(1)(C), requires that in cases where the rule is likely to have a substantial impact on the economy, an opportunity for oral presentation be permitted. It provides:

". . . if any rule, regulation, or order . . . is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses, *an opportunity for oral presentation of views, data, and arguments shall be afforded.* To the maximum extent practicable, such opportunity shall be afforded prior to the issuance of such rule, regulation, or order, but in all cases such opportunity shall be afforded no later than forty-five days after the issuance of any such rule, regulation, or order. A transcript shall be kept of any oral presentation." (Emphasis added.)

Neither party contends that there was compliance with this section, although they do not now dispute that the July regulation would have a "substantial impact on the Nation's economy."

The Government contends that the *July* regulation should not be voided. It argues that Shell was not prejudiced by any noncompliance with the FEAA because the opportunity to comment on the *June* interim rule permitted Shell to participate in the rulemaking process. Moreover, the Government claims that the June interim rule served as the proposed rule to which Section 766(i)(1)(B) required an opportunity to comment; thus, the promulgation of the resulting July regulation was in compliance with that section.

---

**6.** In a memorandum dated March 13, 1975, submitted to the Senate Subcommittee on Administrative Practice and Procedure on the FEA's Enforcement of Petroleum Price Regulations, the FEA admitted that there was "unreasonable delay" between the date of the issuance of Notices of Probable Violation and Remedial Orders. *Hearings before the Senate Subcommittee on Administrative Practice and*

*Procedure on the FEA*, 94th Congress, 1st Session, at 128–129 (1975). (R. 249).

**7.** This was supplemented on February 13, 1976. The case was also remanded to the Regional Administrator of FEA Region VI to determine the appropriateness of the restitution ordered. The Regional Administrator issued a revised order on April 11, 1977.

■ We cannot agree. "A plethora of cases hold that an administrative rule which is not promulgated in accordance with [rulemaking] procedures is void." *City of New York v. Diamond,* 379 F.Supp. 503, 516 (S.D.N.Y.1974). Admittedly, where defects in the compliance with procedural requirements do not defeat the rulemaking process, many courts are unwilling to invalidate the resulting rule. *See, e. g., Common Carrier Conference—Irregular Route v. United States,* 175 U.S.App.D.C. 244, 246, 534 F.2d 981, 983 (1976) ("Even where there is technical flaw in the notice, it can be overcome if the actual conduct of the proceeding provides notice to the participants of what is under contemplation."); *Nader v. Sawhill,* 514 F.2d 1064 (Em.App.1975) (agency neglected to set forth the reasons for the good cause necessary to dispense with certain procedural requirements but because good cause in fact existed, reversal was not warranted); *People of the State of California, State Lands Commission v. Simon,* 504 F.2d 430 (Em.App.1974), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974). However, the deficiencies in the rulemaking procedures in the instant case were more than technical; they defeated the process. Congress recognized that the FEA's final judgment could only be as good as the information upon which it drew, and prescribed certain procedures—stricter than those of the Administrative Procedure Act ("APA")—which would permit it to be educated by the most interested and therefore, hopefully, the most knowledgeable parties. *See Texaco v. Federal Power Commission,* 412 F.2d 740 (3d Cir. 1969). The agency's discretion, and thus its latitude for promulgating unwise rules, was to be restrained through this deliberately prescribed process

for meaningful comment—a competition of ideas, which replaced the restraint once performed by the marketplace's competition for profits. *Cf.* Stewart, *The Reformation of American Administrative Law,* 88 Harv. L.Rev. 1669 (1975). Here, the procedural shortcomings undermined the effectiveness of the educational process which Congress intended the FEAA to provide for agency rulemaking.

■ The requirement in Section 766(i)(1)(C) for an opportunity for oral presentation of views was concededly not satisfied here. This section was intended to provide better informed agency action by permitting "an opportunity for a face-to-face hearing." Remarks of Representative Broyhill, who authored this section, 120 Cong.Rec.H. 1514–15 (March 6, 1974). Failure to comply thwarted the scrutiny to which Congress intended these economic regulations to be subjected.[8]

■ We conclude that the FEA failed to comply with Section 766(i)(1)(B) as well. This section explicitly states that a minimum of 10 days must be allowed for an opportunity to comment after a *proposed rule* is published in the Federal Register. Its requirements are thus stricter than those of Section 553(b)(3) of the APA, 5 U.S.C. § 553(b), which only requires that notice consist of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." The Government argues that the opportunity to comment on the June interim rule, which it contends served as a proposed rule, satisfied the section here. However, hastily conceived, the June interim rule was only a temporary measure taken after the FEO

---

**8.** Related to this deficiency was the fact that no party was aware of the study undertaken for the EPA by Arthur D. Little, Inc., upon which the July regulation was based. "It [is] not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, critical degree, is known only to the agency. [sic]" *Portland Cement Association v. Ruckelshaus,* 158 U.S.App.D.C. 308, 326, 486 F.2d 375, 393 (1973). "Obviously a prerequisite to the ability to make meaningful comment is to know the

basis upon which the rule is proposed." *Id.,* 158 U.S.App.D.C. at 326, 486 F.2d at 393 n. 67. Indeed, Arthur D. Little in a letter to the editor of *Oil and Gas Journal,* dated September 23, 1974, disputed the FEA's interpretation of the study. Furthermore, an opportunity to comment after the rule is promulgated will not suffice. *State of Maryland v. Environmental Protection Agency,* 530 F.2d 215, 222 (4th Cir. 1975), *vacated and remanded,* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977).

realized it had no price regulations for the unleaded gas which was to be made available on July 1, 1974. It was not the product of the careful and deliberate consideration that a proposed rule should be in order to provide interested parties with an effective opportunity to inform the agency of the wisdom of the final rule to be adopted. *See* the remarks of Representative Broyhill, *id.* Because the June interim rule determined unleaded gas prices by reference to those for premium gasoline, the interested parties could not have been aware that they were being asked to comment on the octane comparison formula ultimately adopted in the July regulation.[9] Without sufficient notice of the proposal to be finally adopted, the parties could not comment on the wisdom of the July regulation—although this is clearly what the section contemplated by requiring stricter notice to the parties than the APA.

The Government contends that if the June interim rule cannot be considered a proposed rule, this would mean that any time the agency revises a rule to accommodate the comments it receives, it will have to hold a new rulemaking proceeding. It points out that under the APA, "the notice need not contain 'every precise proposal which [the agency] may ultimately adopt as a rule.'" [citation omitted.] *Ethyl Corp. v. Environmental Protection Agency,* 176 U.S. App.D.C. 373, 420, 541 F.2d 1, 48 (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *accord, International Harvester Co. v. Ruckelshaus,* 155 U.S.App. D.C. 411, 478 F.2d 615 (1973). We need not decide whether the "proposed rule" requirement of Section 766(i)(1)(B) means that the final rule can never differ as a result of the comments received without holding another rulemaking proceeding. We only decide that the June interim rule varied too greatly from the July regulation to permit comments on the June interim rule to apply to the July regulation.[10]

The District Court's decision is accordingly affirmed.

---

9. In fact, the preamble to the July regulation stated that the basis for pricing unleaded gasoline would be that for leaded *regular* gasoline plus 1 cent, possibly indicating that the FEA adopted the octane comparison as an afterthought.

10. Besides, in *Ethyl Corp., supra,* cited by the Government, the Court only held that a fourth formal comment period wasn't necessary where the proposed regulation made it clear that the alternative that was eventually adopted was currently being contemplated. And in *International Harvester Co., supra,* although the Court did rule that the right to comment on EPA methodology was not compelled by statute and that the EPA could thus revise its methodology without permitting comments, the Court did hold that the EPA administrator must sustain the burden of adducing a reasoned presentation supporting the reliability of the EPA's methodology.