**Ben SHIMEK, et al.,**
**Plaintiffs-Appellants,**

**v.**

**DEPARTMENT OF ENERGY, et al.,**
**Defendants-Appellees.**

No. C–79 2063 WWS.
No. 9–55.

Temporary Emergency Court of Appeals.

Argued March 11, 1981.

Decided Sept. 14, 1981.

John Hawkins, Hawkins & Donahue, San Francisco, Cal., for plaintiffs-appellants.

Christine Nicholson, Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., and Mark C. Rutzick, Dept. of Justice, Washington, D. C., were on the brief, for defendants-appellees.

Before CHRISTENSEN, DUNIWAY and ZIRPOLI, Judges.

ZIRPOLI, Judge.

Eleven independent retailers of gasoline and the California Service Station Association ("appellants") appeal from an order of the District Court for the Northern District of California denying their motion for partial summary judgment and granting the motion of the Department of Energy ("DOE") and Charles Duncan for summary judgment. The district court concluded that certain amendments to the DOE's regulations governing retail prices for gasoline are procedurally and substantively valid and that appellants are not entitled to declaratory or injunctive relief. We affirm.

## I. BACKGROUND

Prior to the rulemaking at issue here, price regulations promulgated by the DOE[1] allowed a retailer to sell gasoline at a price equal to its "weighted averaged selling price" as of May 15, 1973, plus increases in the price it pays for its gasoline ("product cost increases"), increases in general "non-

product" costs up to three cents a gallon, increases in rent, and a portion of the cost of vapor recovery systems. 10 C.F.R. Part 212 (1978). Additionally, a retailer could "bank" for future use product cost increases it did not recover in the month in which it incurred them. *Id.*

On May 14, 1979, the DOE issued a notice of its intent to reexamine those retail price regulations. 44 Fed.Reg. 29,090 (May 18, 1979). Its reasons were: (1) to respond to requests from retailers to simplify the regulations; and (2) to respond to changes in market conditions within the past year, including "reductions in allocation levels and uncertainty about future supply levels to retailers. . . ." *Id.*

On June 22, 1979, the DOE issued a Notice of Proposed Rulemaking and Public Hearing ("NPRM"), inviting comments on proposed amendments to the price regulations. 44 Fed.Reg. 37,316 (June 26, 1979). The proposed amendments would: (1) alter the method of computing the maximum lawful selling price so that a retailer could charge its most recent acquisition cost plus a "fixed cents per gallon markup" plus certain taxes; (2) eliminate all "banked" cost increases; and (3) eliminate the separate "passthrough" of the costs of vapor recovery systems. The NPRM included the text of the proposed amendments with the amount of the fixed cents per gallon markup omitted. It invited interested parties to comment on the proposed amendments, including the amount of the markup, and on three alternatives. It recited the same purposes for the changes as did the May 14 Notice of Intent, but provided much more detail.

On July 3, 1979, "[i]n view of the immediate need to enhance enforcement of its retailer price rules and the economic hardships being suffered by retail dealers of motor gasoline," the DOE announced that the period for public comment on the proposed amendments would terminate on July 12 rather than July 26, as originally planned. 44 Fed.Reg. 40,329 (July 10, 1979).

---

1. The rulemaking was actually conducted by the Economic Regulatory Administration, a division of the DOE. For convenience, we shall refer to all the DOE's divisions and predecessor agencies and to both defendants collectively as "the DOE."

On July 10–13, the DOE held hearings in San Francisco, California and Washington, D. C. Representatives of some of the appellants testified. In addition to the testimony given at the hearings, the DOE received approximately 450 written comments.

On July 19, 1979, the DOE published a "Final Rule," adopting the proposed amendments in substantial part, effective July 15. 44 Fed.Reg. 42,541 (July 19, 1979). The final version of the amendments differed from the proposal primarily in that it provided a 15.4 cents per gallon markup and procedures for adjusting that markup to take account of inflation. *Id.* at 42,545.

In a notice accompanying the final rule, the DOE set forth in greater detail and in the form of conclusions drawn from comments and testimony the reasons given earlier for the amendments. It also provided its reasons for finding that strict compliance with all of the procedural requirements of the Department of Energy Organization Act ("DOEOA"), 42 U.S.C. sections 7101–7352, was likely to cause serious harm or injury to the public health, safety, and welfare. These were: (1) that there were significant problems with enforcement of the old regulations; (2) that "severe disruptions and imbalances in the supply and distribution of motor gasoline could develop in the coming months"; and (3) that retailers' use of "banks" of unrecovered product cost increases to increase their prices was having an inflationary impact and, in turn, causing "serious economic harm and injury." 44 Fed.Reg. at 42,544.

The final rule extended the period for comment on the amendments until November 16, 1979. On May 19, 1980, the DOE repromulgated the amendments in substantial part, and published responses to the major comments. 45 Fed.Reg. 36,049 (May 29, 1980).

Appellants sued the DOE for declaratory and injunctive relief, alleging that the July 15 amendments are procedurally and substantively invalid. They moved in the district court for partial summary judgment; the DOE cross moved for summary judg-

ment. After much briefing and two hearings, the district court denied appellants' motion and granted the DOE's. It explained its reasoning at the hearings, and entered a brief order stating its conclusions.

## II. PROCEDURAL VALIDITY

### A. *Waiver of Procedural Requirements*

Both the DOEOA and the Administrative Procedure Act ("APA"), 5 U.S.C. sections 551–59, allow the DOE to waive the procedural requirements in certain circumstances. The APA allows waiver "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. section 553(b)(B). Under the DOEOA, the agency may avoid the normal procedures "where strict compliance is found by the Secretary to be likely to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule." 42 U.S.C. section 7191(e).

Appellants argue that the waiver of strict compliance was not justified in this case because (1) the agency failed to set out its findings "in detail" and (2) even if its findings were adequately detailed, as a matter of law the conditions they described did not justify the agency's use of emergency rulemaking procedures. They contend that the DOEOA requires more than the APA "good cause" provisions in both respects.

### 1. *Detailed Findings*

■ This court has never confronted the question whether or not section 7191(e) requires a more detailed statement of the reasons for waiving procedural requirements than does the APA. Nor has it considered whether or not the inadequacy of findings made pursuant to section 7191(e) would, without more, invalidate a rule. We need not answer either question today, for without defining the minimum level of detail required by section 7191(e), we conclude that the findings in the final rule were sufficient.

The DOE did not simply state conclusorily that waiver was justified. It made three separate findings of fact: (1) that there were significant problems with enforcement of the old regulations; (2) that the gasoline supply and distribution system was threatened with "severe disruptions and imbalances"; and (3) that the inflationary impact of retailers' use of "banks" of unrecovered product cost increases during the current shortage was causing "serious economic harm and injury." 44 Fed.Reg. 42,544 (July 19, 1979). Further, in the "Background" section of the final rule, the DOE described some of the evidence on which it based its findings, and stated that "[f]or these reasons, among others, we have determined that certain immediate changes in the price rules are required." Id. at 42,542.[2]

The findings and the "Background" section of the final rule identify the circumstances which the agency considered to be of an "emergency" nature and describe how those circumstances had affected and would continue to affect the public health, safety, and welfare if the notice and comment provisions of section 7191 were observed. Whether or not the findings are accurate and whether or not they describe conditions which justify waiver, there can be no doubt that they were "set out in detail."

### 2. The Need for Emergency Rulemaking

■ Appellants state cryptically that the only findings supported in the administrative record is that the old retail price rule was unintelligible and unenforceable. We have indicated above that we consider the findings adequately supported in the "Background" section of the final rule. But even if they are adequately supported, contend appellants, the circumstances they describe cannot, as a matter of law, justify waiver.

Appellants describe the DOE's reasons for deviating from the prescribed procedures as a desire to clarify ambiguities in the existing regulations, a desire to simplify enforcement by replacing old regulations, and a desire to avert harm to a single segment of the retail gasoline industry rather than to the public at large. They argue that each of these reasons has been held insufficient to warrant resorting to emergency rulemaking procedures.

But they mischaracterize the DOE's findings. The agency found that "in the current shortage situation" the existing regulations were becoming so unworkable that the entire gasoline distribution system was threatened, and that "serious economic harm and injury" was already resulting from the "inflationary impact and price distortions" caused by retailers' recovery of "banked" cost increases. Thus, it was concerned with more than simply clarifying ambiguities and simplifying enforcement for the sake of orderliness. It sought to remedy shortcomings in its regulations which had become serious only as a result of sudden changes in market conditions. And the harm that could have resulted from those shortcomings was obviously to the general public rather than simply to a single segment of the retail industry.

In a related vein, appellants argue that the DOE was aware of or should have foreseen all of the circumstances it claims justified its waiver in plenty of time to comply with the notice and comment provisions of section 7191. They state repeatedly that the DOE had known how complex the regulations were and that the regulations could be inflationary. They further argue that the 1979 gasoline shortage began in January of that year and that the DOE did not offer any evidence or make any findings to the effect that the shortage worsened between June 26, when the NPRM was issued, and July 10, when the comment period was shortened.

The foreseeability of an emergency and the length of time the agency knew of it have been central themes in this court's

---

**2.** The DOE does not specifically refer in the section of the final rule styled "Procedural Requirements" to the section styled "Background." But the two sections discuss the same subjects in the same order, and reach the same conclusion: immediate changes are necessary. Thus, it is entirely appropriate to consider the "Background" section in evaluating the agency's findings in support of waiver.

review of DOE's emergency rulemaking. In *Consumers Union v. Sawhill*, 523 F.2d 1404 (Em.App.1975), we invalidated an emergency rule setting prices on unleaded gasoline because the agency knew of the purported emergency (Environmental Protection Agency regulations requiring that unleaded gasoline be made available) sixteen months prior to the promulgations of the rule. Similarly, in *Shell Oil Co. v. FEA*, 527 F.2d 1243 (Em.App.1975), we rejected the agency's argument that new regulations were needed immediately because of the imminent expiration of the statutes underlying the old regulations. We concluded that the effects of the expirations were not so unforeseeable that advance notice of the proposed regulations could not have been given.

In each of those cases, however, the "emergency" was that a new regulation was needed as of a certain, preordained date, about which the agency knew well in advance. Here, no date was set in advance on which the regulatory scheme would be made intolerably inadequate by reduced gasoline allocations. Rather, the problems evolved over time. The DOE presented the district court with an affidavit in which Douglas Robinson, an administrator who participated in the rulemaking, described the incremental development of the "gasoline crisis" over the spring and summer of 1979. He stated that "[i]n June 1979, there was yet another substantial reduction in allocations, and the long gasoline lines spread [beyond California where they first appeared] . . . ." Amended Record on Appeal, 00218.[3]

The case at bar is further unlike those described above in that the "emergency" nature of the circumstances was not the inevitable result of the DOE's failure to meet a legislatively or administratively imposed deadline. The severity of the gasoline shortage's impact on each of the factors about which the DOE was concerned—en-

forcement, dealer viability, and the inflationary impact of the recovery of "banked" cost increases—under the old regulations could only be determined through empirical observation. The DOE stated in the NPRM that "a principal purpose of this rulemaking will be to build a solid factual record regarding each of these factors to enable ERA to assess the need for amendments to the reseller price rule," 44 Fed.Reg. 37,317 (June 26, 1979), and solicited comments, "documented with financial data" on the need to modify the regulations, *Id.* The agency relied on the comments elicited by the NPRM and on testimony presented at the hearings in determining "that certain *immediate* changes in the price rules are required." 44 Fed.Reg. 42,542 (July 19, 1979) (emphasis added). Only after it began to receive such comments was the DOE able to tell just how pressing the need for the amendments was.

For these reasons, appellants' "foreseeability" argument must fail. The record demonstrates that by July of 1979, but not until then, the inadequacy of the existing regulations to deal with sharply reduced supplies of gasoline and large "banks" of unrecovered cost increases had reached crisis proportions. The DOE was justified in using emergency rulemaking procedures to replace the inadequate (indeed, "harmful" in the case of the "banked costs") regulations.

### B. Compliance Within a Reasonable Time

■ Under the DOEOA, when the agency waives the procedural requirements of section 7191(b), (c), and (d), it must satisfy those requirements "within a reasonable time subsequent to the promulgation of the rule . . . ." 42 U.S.C. section 7191(e). Appellants do not deny that the DOE's extension of the comment period until November 16, 1979, and its response to the comments on May 19, 1980, satisfied subsections (b)

---

**3.** Following the normal briefing period, the parties submitted supplemental briefs in which they argued extensively about what should be considered properly part of the record on appeal. We adopt the DOE's "Amended Record on Appeal" as a supplement to rather than a replacement for appellants' original "Record on Appeal," ignoring all duplication and accepting signed rather than unsigned affidavits.

and (d). But they contend that the DOE improperly failed to provide an opportunity for oral presentation of views, data, and arguments after promulgation. In response to the DOE's assertion that it did not waive compliance with the oral presentation requirement and therefore did not need to provide a subsequent opportunity for such presentation, appellants argue that the hearings held in July were inadequate for purposes of section 7191(c)(1). Because no hearings were in fact held after the July 15 amendments were adopted, the determinative question here is whether or not the July hearings were sufficient.

The basis of appellants' attack on the July hearings is that the proposed rule published in the NPRM did not include the *amount* of the fixed cents per gallon markup.[4] They contend that the size of the markup was of primary concern to them, and that the absence of a specific proposed amount, combined with the number of other issues presented, precluded the kind of "focus" on this key issue that the procedural requirements were designed to foster.

We disagree. Appellants rely heavily on this court's observation in *Shell Oil Co. v. FEA*, 574 F.2d 512 (Em.App.1978), that by requiring publication of the proposed rule itself, 15 U.S.C. section 766(i)(1)(B) (which preceded and is, for our purposes, comparable to section 7191(b)(1)) was "stricter" than the corresponding section of the APA, 5 U.S.C. section 553(b)(3), "which only requires that notice consist of 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.' . . .," *Shell, supra*, at 516. In *Shell*, the agency attempted to rely for its

publication of a proposed rule on an interim price regulation which used a price calculation formula entirely different from the one adopted in the final rule. The district court found that the interim rule could not be considered a proposed final rule because it purported to be only a temporary rule, and the accompanying invitation to comment on "what the final price rule . . . should be," *Shell Oil Co. v. FEA*, 440 F.Supp. 876, 885 (D.Del.1977) (quoting 39 Fed.Reg. 18,638 (May 29, 1974)), indicated that the agency had not formulated a proposed rule. We affirmed, adding that because the interim rule provided a specific formula, "interested parties could not have been aware that they were being asked to comment on [the different formula ultimately adopted] . . .," 574 F.2d at 517.

But here, the NPRM contained what clearly purported to be a proposed final rule, with only the amount of the fixed cents per gallon markup left blank. And with the statement that the amount would "reflect nonproduct cost increases," the DOE requested "comments documented with financial data on what the amount . . . should be." 44 Fed.Reg. 37,317 (June 26, 1979). This form of notice "provide[d] interested parties with an effective opportunity to inform the agency of the wisdom of the final rule to be adopted," *Shell, supra*, at 517, and to participate in fashioning an important part of that rule. A suggested amount would have increased the "focus" of the comments but little.

Therefore, because the DOE did not purport to waive the requirement of section 7191(c)(1),[5] and because it complied[6] with that requirement prior to promulgation, its

---

**4.** Appellants seem to argue that this omission also rendered the NPRM inadequate for purposes of subsection (b)(1), and thus constitutes an independent flaw in the rulemaking procedure. Because the DOE clearly and properly waived the notice and comment provisions of that subsection, this argument, if Appellants in fact make it, must fail.

**5.** We note that the requirement that an opportunity for oral presentation be provided is independent of and distinct from requirement of a thirty day comment period. Unlike § 7191(b)(1), which requires publication of the

proposed rule itself a minimum of thirty days before promulgation of the final rule, § 7191(c)(1) contains no provision whatsoever for notice prior to the opportunity for oral presentation. It is obvious that if the opportunity for oral presentation is to serve the educational and "due process" purpose for which it was intended, it must follow some reasonably specific notice of the proposed agency action by some reasonable length of time. But it is not equally obvious, as appellants assume, that nothing short of publication of the proposed rule itself can stimulate meaningful oral comment. *Cf.* 5 U.S.C. § 553(b) ("The notice shall

failure to provide an additional opportunity for oral presentations afterwards does not affect the validity of the amendments.

### III. SUBSTANTIVE VALIDITY

 Appellants argue that the July 15 amendments are not rationally related to the objectives of the emergency rulemaking as explained in the July 19 findings, and that the agency exceeded its authority in several respects. We find the "rational basis" arguments without merit. As to the "excess of authority" arguments, we agree with the findings of the court below that the elimination of the "banks" of product cost increases did not constitute retroactive application of a new rule, that the limiting provisions of the Emergency Petroleum Allocation Act on which appellants rely, 15 U.S.C. section 753, were no longer applicable in July of 1979, and that the July 15 amendments do not violate the amendment to the Clean Air Act on which appellants rely, 42 U.S.C. section 7624(a). We see no reason to comment further on these issues.

### IV. CONCLUSION

We conclude that: (1) the DOE's findings that strict compliance with the procedural requirements of 42 U.S.C. section 7191 was likely to cause serious harm or injury to the public health, safety, and welfare, published in the final rule, were sufficiently detailed for purposes of 42 U.S.C. section 7191(e); (2) the DOE was justified in waiving those procedural requirements which it did, in fact, waive; (3) because the agency provided an adequate opportunity for oral presentation of views, data, and arguments prior to promulgation of the July 15 amendments, its failure to provide further opportunity for such oral presentation did not violate 42 U.S.C. section 7191(e); (4) the July 15 amendments are therefore procedurally valid; and (5) those amendments are substantively valid. For these reasons, the judgment of the district court is AFFIRMED.

include ... (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."). Because we hold that the DOE did publish the proposed rule in compliance with § 7191(b)(1) (and because we expect such piecemeal waiver of the rulemaking procedures as occurred here to be rare), we need not and do not decide whether or not a less specific form of notice (such as that required in 5 U.S.C. § 553) might satisfy § 7191(c)(1).

**6.** Appellants make much of the requirement of § 7191(e) that the agency finds that "strict

compliance" with the procedural requirements would be likely to endanger the public health, safety, and welfare. They infer from this language that absent waiver, the agency must "strictly" rather than "substantially" comply. They further infer that if the agency validly waives compliance, its subsequent satisfaction of the requirements must also be "strict." We do not opine on these interpretations of the statute: whether styled "strict" or "substantial" compliance, the opportunity for oral presentation provided in July was well within the requirements of § 7191(c)(1).