**COUNTY FUEL COMPANY, INC.**

v.

**UNITED STATES DEPARTMENT OF ENERGY.**

**Civ. No. Y–85–4360.**

United States District Court,
D. Maryland.

Sept. 25, 1986.

---

Edward L. Blanton, Jr., Kevin M. McGeady, Towson, Md., for plaintiff.

Arthur S. Weissbrodt, Erich T. Schwartz, Washington, D.C., Breckinridge L. Willcox, U.S. Atty. for Md., Carmina S. Hughes, Asst. U.S. Atty., Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Plaintiff County Fuel Company filed this suit to set aside a Remedial Order ("RO") issued against it by the Department of Energy. The RO concluded that County Fuel violated the provisions of 10 C.F.R. 212.93 by charging gas prices in excess of its maximum lawful selling price ("MLSP"), and demanded that County Fuel pay the amount of the overcharges, $197,-305.49, plus interest. The Federal Energy Regulatory Commission ("FERC") affirmed the Remedial Order on August 23, 1985. County Fuel claims that the pricing regulations that applied to it during the majority of the audit period, March 1, 1979–March 18, 1980, were arbitrary and capricious and without rational basis. The parties have submitted cross motions for summary judgment, and the Department of Energy ("DOE") has filed a certified copy of the administrative record in the case. No hearing is necessary. Local Rule 6.

The government's complicated effort to regulate gasoline prices was a holdover from the wage and price controls of the early 1970's and the Arab oil embargo. In response to rising inflation, Congress passed the Economic Stabilization Act of 1970, authorizing the President to impose wage and price controls. The Cost of Living Council administered wage and price controls over most sectors of the economy,

including the petroleum industry. Most of the controls were phased out by 1973, but the oil embargo prompted Congress to pass the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 *et seq.,* which directed the President to adopt mandatory pricing and allocation regulations for oil within fifteen days. The newly-created Federal Energy Office, predecessor of the DOE, adopted the old Cost of Living Council petroleum regulations with minor changes.

Those original regulations defined three classifications of sellers distributing refined petroleum products—"retailers," "resellers" (who bought refined products without changing their form, and sold them to "purchasers other than ultimate consumers"), and "reseller-retailers." 10 C.F.R. 212.31, 39 Fed.Reg. 1924. Reseller-retailers sold some products to ultimate consumers, and also resold finished products. County Fuel sold over ¾ of its products in tank wagon lots to large-volume end-users, or "ultimate consumers." It also resold finished products to other sellers. County Fuel was thus a reseller-retailer under the regulations.*

Until 1979, the classifications were irrelevant to the most crucial provisions of the regulations—the prices that retailers, resellers, and reseller-retailers could charge for refined petroleum products. Under 10 C.F.R. 212.93, all three classifications were limited to:

> the weighted average price at which the item was lawfully priced by the seller in transactions with the class of purchasers concerned on May 15, 1973, plus an amount which reflects, on a dollar-for-dollar basis, the increased product costs concerned.

In addition to increased product costs, sellers could charge higher prices to reflect higher non-product costs. Sellers could "bank" any non-product costs they did not pass on immediately, and "passthrough" the costs in the form of higher prices later,

subject to some limitations. 10 C.F.R. 212.-93(e). Essentially, the regulations aimed at freezing profits per gallon at their 1973 levels, in absolute dollar terms.

On Tuesday, June 26, 1979, three months into County Fuel's audit period, the DOE issued a Notice of Proposed Rulemaking and Public Hearing. 44 Fed.Reg. 37316. The Notice suggested that the cost passthrough provisions were too complicated, and had not kept pace with inflation. The Notice stated that DOE was considering eliminating the passthrough system and allowing a more generous fixed mark-up above current acquisition costs for retailers.

DOE recognized that the same problems might apply to resellers, and invited comments on their situation. However, DOE did not propose a specific amendment to the regulations concerning resellers, and was entirely silent as to reseller-retailers. 44 Fed.Reg. 37319.

The severe gas shortage that summer reduced sales volumes at retail gas stations and threatened their viability. As a result, DOE cut short the comment period on its proposed rulemaking. 44 Fed.Reg. 40329 (July 10, 1979). Only three days after the close of the public comment period, DOE issued emergency amendments to the pricing regulations, effective July 16. The amendments allowed *retailers* a fixed mark-up of 15.4 cents per gallon above their most recent acquisition cost. 44 Fed. Reg. 42542 (July 19, 1979).

■ DOE identified three problems with the old price regulations that led it to adopt the new amendments. First, the passthrough and banking provisions were too complex. Sellers could not understand them, and DOE enforcement efforts were hampered by the necessity for long, complex audits. Second, reduced sales volumes and the failure of the passthrough provisions to keep up with inflation threatened to drive many retailers out of busi-

---

* DOE contends that under its regulations a "retailer" that made *any* "resales" of gasoline

would become a "reseller-retailer." R. 60–61.

ness. Third, the banking rules were unfair and occasionally inflationary. Most retailers could not perform the sophisticated accounting necessary to bank unrecovered non-product cost increases. The few capable of taking advantage of the banking provisions saved their allowable price increases for shortage periods, when they could command any price. 44 Fed.Reg. 42451 (July 19, 1979); Regulations Preambles 1974–1981 Energy Mgmt. (CCH) (hereinafter "Preambles") ¶ 40,453, 40,983–80—40,983–81.

It is obvious that all three identified problems with the old regulations applied equally to reseller-retailers. The regulations covering reseller-retailers were just as complex. Reduced volume at the end of the pipeline reflected reduced volume in the middle. Reseller-retailers were just as limited in their abilities to pass on inflationary costs. And DOE did not suggest that the banking provisions worked any better for reseller-retailers.

Yet DOE gave retailers an immediate break and "continued" the rulemaking with respect to retail sales by refiners and resellers. Preambles, ¶ 40,453, 40,983–84. In May, 1980, DOE finally adopted new pricing regulations for reseller and reseller-retailers, giving them the option of using a fixed mark-up or continuing to use "banks" under the old regulations. 45 Fed.Reg. 29546 (May 2, 1980). The change came too late for County Fuel—its audit period ended a month earlier, on March 18, 1980.

DOE did not offer any explanation for this disparate treatment. Nor did it deal with the disparity when County Fuel attempted to challenge the enforcement proceedings against it. At oral argument before the DOE, counsel for County Fuel argued that the different treatment of retail sales by "reseller-retailers" as opposed to "retailers" was unfair, arbitrary and capricious. Administrative Record 347–351 (hereinafter "R. _____"). In response, counsel for the Department argued that County Fuel willfully disregarded the regulations, that other reseller-retailers complied with the regulations, and that County

Fuel should have applied for a special exception to the regulations if they were unfair.

DOE's opinion issuing the final Remedial Order against County Fuel also ignored the disparate treatment issue. DOE simply stated, "With respect to the Fixed Margin Price Rule [adopted for retailers in July], the Temporary Emergency Court of Appeals has held that the July, 1979 amendments to section 212.93 were procedurally and substantively valid. *Shimek v. DOE*, 685 F.2d 1372 (Temp.Emer.Ct.App.1981)." R. 384. The *Shimek* case was brought by retailers who did not like the fixed mark-up, and the court never considered the status of reseller-retailers under the new rule.

When County Fuel appealed the Remedial Order to the Federal Energy Regulatory Commission ("FERC"), FERC explicitly considered County Fuel's argument that the July, 1979 rule imposing different pricing regulations for the retail sales of "retailers" and "reseller-retailers" was arbitrary and capricious. FERC upheld the rule, writing:

DOE examined the relevant data, articulated a satisfactory explanation for its actions including a rational connection between the facts found and the choice made, and made no clear errors of judgment.

R. 602.

FERC did not say where in the record DOE considered the disparate treatment of reseller-retailers, or where in the record DOE provided a "satisfactory explanation" for that disparate treatment. FERC did invent a rationale for DOE's action, however: "Where DOE's objective was to limit retail price increases and where a retailer's prices were limited by its acquisition cost plus mark-up, it was logical for DOE to limit what that acquisition cost could be through regulations on the prices charged by reseller-retailers."

DOE itself never offered that explanation for its disparate treatment of reseller-retailers. Even if it had, that rationale would justify price limitations on *resales* of gasoline only. It would not justify price

limitations on *retail sales* of gasoline by reseller-retailers.

In its brief to this Court, DOE offers another explanation for the disparate treatment:

> Faced with emergency conditions and the threat of nationwide disruption of gasoline distribution, DOE was forced to act quickly. In addressing that crisis through its emergency rulemaking authority, it was reasonable for DOE to write its regulatory amendment narrowly. Its decision to do so, and limit the applicability of this emergency departure from its historic price rule to retailers, the type of sellers about which evidence of necessity was clear, was rationally based.... The rationality of that original decision is further supported by the results of DOE's continued rulemaking regarding gasoline sales by "reseller-retailers." As the Preamble noted, the comments made clear the fact that the petroleum firms included in that group are extremely diverse.... Clearly the agency was not required to adopt (and indeed with the light of experience declined to adopt) the alternative advocated by County today: the hasty and uninformed imposition of a fixed mark-up limitation on all retail sales of gasoline by any seller.

DOE's Brief in Support of Defendant's Cross-Motion for Summary Judgment at 23–24.

DOE's argument highlights the conceptual difficulty with this case that apparently led the agency astray. When DOE responded to the gas shortage in the summer of 1979, the classifications of resellers, reseller-retailers, and retailers were already in place. But the regulations on pricing treated all three classifications essentially the same. To DOE, which took those classifications as given, it appeared reasonable to deal with retailers first. But the practical effect of creating different pricing regulations was to give the classifications meaning for the first time.

What DOE really did in July of 1979 was declare an emergency and give quick relief to one segment of the retail market. It did not explain satisfactorily why other segments of the retail market did not receive the same treatment. If DOE had been regulating the fast-food hamburger market instead, it would have allowed instant price increases for McDonald's and Burger King hamburgers, because they presented the most numerous and politically obvious problem. Then DOE would have studied all other fast-food restaurants that sold hamburgers, explaining that other fast-food places were "diverse." A year later, DOE would have allowed the rest of the fast-food operators to raise their prices too. Obviously, that is not a rational regulation for fast-food hamburgers, and it was not a rational regulation for retail sales of gasoline.

■ Accordingly, the case will be remanded to DOE. In recalculating County Fuel's overcharges, DOE must use the same pricing regulations that applied to retailers' sales of gasoline. Anything else would be arbitrary and capricious, and without rational basis.

■ County Fuel also argues that it was denied the opportunity to produce testimony concerning the accuracy of DOE's audit figures. DOE had done a previous audit for an earlier period of County Fuel's operations, in which it had determined County Fuel's selling prices in May of 1973, the base period under the old pricing regulations. DOE eventually disregarded that previous audit, and decided to take no action on it. County Fuel offered affidavits from a CPA, William I. Kissinger, and from Charles Fisher, the previous owner of County Fuel's corporate predecessor, to the effect that the previous audit was inaccurate. County Fuel wanted to call Kissinger and Fisher as live witnesses.

DOE used the figures from the old audit to determine County Fuel's selling prices in May of 1973. Otherwise the previous audit was irrelevant. Although County Fuel was prepared to offer testimony that the previous audit was inaccurate *in toto*, it had no specific evidence that the figures calculat-

ing the May, 1973 prices were inaccurate. Counsel for County Fuel admitted as much in oral argument before the DOE. R. 361. Therefore, DOE's refusal to allow an evidentiary hearing was reasonable.

## ORDER

In accordance with the attached Memorandum, it is this 25th day of September, 1986, by the United States District Court for the District of Maryland, ORDERED:

1. That the Department of Energy's disparate treatment of the retail sales of gasoline by "retailers" and "reseller-retailers" from July 19, 1979 to May 2, 1980, was arbitrary and capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence;

2. That plaintiff's motion for summary judgment BE, and the same IS, hereby GRANTED;

3. That defendant's cross-motion for summary judgment BE, and the same IS, hereby DENIED;

4. That the Department of Energy's Remedial Order against County Fuel BE, and the same IS, hereby SET ASIDE; and

5. That the case be remanded to the Department of Energy for proceedings in conformity with the attached Memorandum.