**COUNTY FUEL COMPANY, INC.,**
Plaintiff-Appellee,

v.

**UNITED STATES DEPARTMENT OF
ENERGY, Defendant-Appellant.**

No. 4–8.

Temporary Emergency Court of Appeals.

Argued May 20, 1987.

Decided Aug. 12, 1987.

Rehearing Denied Sept. 16, 1987.

Maureen M. Katz, Economic Regulatory Admin., Dept. of Energy, Washington, D.C., with whom Theodore A. Miles and Arthur S. Weissbrodt, Economic Regulatory Admin., Dept. of Energy, were on brief, for defendant-appellant.

Kevin M. McGeady, Blanton & McCleary, Towson, Md., with whom Edward L. Blanton, Jr., Blanton & McCleary, was on brief, for plaintiff-appellee.

Before HOFFMAN, METZNER and MAXWELL, Judges.

WALTER E. HOFFMAN, Judge:

The Department of Energy (DOE) appeals an order of the United States District Court for the District of Maryland granting the motion of County Fuel Company, Inc. (County) for summary judgment, denying DOE's cross-motion for summary judgment and setting aside DOE's Remedial Order against County, 644 F.Supp. 294 (D.Md. 1986). The district court found that DOE's disparate treatment of the retail sales of "retailers" of refined petroleum products from the retail sales of "reseller-retailers" under 10 C.F.R. § 212.93 from July 19, 1979 to May 1, 1980, was "arbitrary and capricious, an abuse of discretion, not in accordance with law and unsupported by substantial evidence."

I

Although the district court determined that DOE's disparate treatment of retailers and reseller-retailers was not rational under the circumstances, this court need accord the district court's decision no particular deference and is free to make an independent determination of whether the agency's action was reasonably supported by the administrative record. *Mobil Oil Corporation v. Department of Energy*, 728 F.2d 1477, 1486 (Temp.Emer.Ct.App. 1983), *cert. denied, Murphy Oil Corp. v. Naph-Sol Refining Co.*, 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984) (Mobil II). In reviewing DOE's action *de novo*, this Court's scope of review is determined by

statute. Title 15 U.S.C. § 754 applies § 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904, note, to regulations promulgated to cover refined petroleum products. Section 211(d)(1) incorporates 5 U.S.C. § 706(2), which states in relevant part:

The reviewing court shall—

(2) hold unlawful and set aside agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law....

In *Mobil II*, 728 F.2d at 1486, this Court extensively examined the scope of review under the arbitrary and capricious standard and stated, "[t]he scope of review ... is narrow and a court is not to substitute its judgment for that of the agency." *Quoting, Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). However, in reviewing agency action, a court must inquire "whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions approved by the administrative body." *Mobil Oil v. Department of Energy*, 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (Mobil I); *Texaco, Inc. v. Federal Energy Administration*, 531 F.2d 1071, 1076–77 (Temp.Emer.Ct.App.1976), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed 2d 447 (1974).

Title 15 U.S.C. § 753(b)(1) states that price regulation shall attempt to achieve to the maximum extent possible certain objectives. The objectives relevant to our consideration include:

(A) protection of public health ... safety and welfare ...

(D) preservation of an economically sound and competitive industry, including priority needs to restore and foster competition ... and preserve competitive viability ...

(F) equitable distribution of ... refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry ...

(H) economic efficiency ...

(I) minimization of economic distortion, inflexibility and unnecessary interference with market mechanisms.

In *Mobil I*, 610 F.2d at 801, this Court stated that no single factor set forth in § 753(b)(1) was inherently more important than any of the other factors and that all of the factors were to be balanced objectively. *See, Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391, 1397 (Temp.Emer. Ct.App.1975). "A reviewing court, thus, may not set aside an agency rule that is the product of reasoned decision making, based on consideration of relevant factors, and within the scope of the authority delegated to the agency by statute." *Mobil II*, 728 F.2d at 1486. Under the standard of review discussed above, this Court is asked to determine whether DOE's delay in setting forth price regulations affecting the retail sales of reseller-retailers was arbitrary and capricious when DOE took immediate action to alleviate the critical problems facing retailers.

## II

A review of the pertinent facts is helpful for an understanding of DOE's action. Three classes of sellers of refined petroleum products—retailers, resellers and reseller-retailers—are defined in 10 C.F.R. § 212.31. Retailers resell covered products only to ultimate consumers. Resellers resell covered products "without substantially changing their form to purchasers other than ultimate consumers." 10 C.F.R. § 212.31. Reseller-retailers perform the functions of both resellers and retailers. County's principle operation involved the sale of gasoline to large volume end users, primarily in tank wagon lots. Such retail sales accounted for approximately 80 percent of County's business. County never operated a retail gasoline service station.

County also sold gasoline to a small number of customers who were retailers (namely marinas and filling stations), which accounted for approximately 20 percent of County's total sales volume. Consequently, DOE classified County as a reseller-retailer.

10 C.F.R. § 212.93(a) set forth the price scheme which covered the three classifications from its adoption in 1973 until July 15, 1979. The regulation defined the maximum lawful selling price (MLSP) applicable to sellers of refined petroleum products as "the weighted average at which the item was lawfully priced by the seller in transactions with the class of purchaser concerned on May 15, 1973, plus an amount which reflects on a dollar-for-dollar basis, the increased product costs concerned" (the May 15 rule). Sellers were allowed to recoup certain unrecovered product costs by "banking" those costs and adding such banked costs to the MLSP in a later sales period. 10 C.F.R. § 212.93(e)(1). In order to preserve the price differentials which existed in the previously unregulated market, 10 C.F.R. § 212.93(e)(1) further provided that sellers which engaged in transactions with diverse classes of purchasers were deemed to recover from all classes of purchaser the largest amount of increased product costs recovered from any class (the equal application rule).

Because of the cutback in Iranian crude oil production in late 1978, a severe gasoline shortage arose during the summer of 1979. The shortage threatened the economic viability of many retail gasoline stations. While the record indicates that the owners of retail gasoline stations importuned DOE to alleviate their distress, the record is barren of the content of complaints registered by other seller segments in the industry. DOE's first response to the crisis was to address the disruptions in distribution of gasoline by adopting emergency amendments which were designed to improve the flow of gasoline to indepen-

dent dealers. 44 Fed.Reg. 26712 (May 4, 1979); 44 Fed.Reg. 42538 (July 19, 1979).

DOE next turned its focus to the problems arising from the existing pricing scheme. On May 14, 1979, DOE noted its intent to reexamine the retailer price regulations applicable to motor gasoline in light of retailers' reduced allocations of gasoline and increasing non-product costs. 44 Fed. Reg. 29090 (May 18, 1979). DOE stated that the petitions for rulemaking which prompted the reexamination indicated that the present price regulations did "not permit retailers to earn an adequate profit on sales of motor gasoline." *Id.* DOE issued a Notice of Proposed Rulemaking and Public Hearing (NOPR) on June 22, 1979. 44 Fed.Reg. 37316 (June 26, 1979). The NOPR indicated that DOE had recognized the exigent circumstances caused by the oil shortage and had identified a number of problems with existing regulations made apparent by the decreased flow of oil. The existing regulations did "not allow upward margin adjustments for decreased allocations to individual stations" *Id.*, at 37317. Thus, since many individual dealers' supplies were cut by up to 20 percent, there was a corresponding decrease in profits. Furthermore, except in limited instances, under the existing regulations, the non-product costs passthrough allowances had not been increased since 1974. *Id.* DOE set forth proposed amendments to the regulations which included a fixed cents markup to the current acquisition price and the elimination of banked costs provisions. The amendments were designed to account for increased non-product costs and the decreases in allocations. DOE also invited comments on "[t]he effect of the proposed amendments and alternative proposals on competition at the retail level and, accordingly appropriate amendments to the refiner and reseller price rules" *Id.*[1] DOE further requested comments on whether it should adopt similar rules to the proposed amendments for refiners and resellers.

---

1. Throughout the Federal Register the term "reseller" is often intended to include reseller-retailers; *see, e.g.,* 44 Fed.Reg. 42544, which speaks of "retail sales of gasoline by refiners and resellers." The only "resellers" with retail sales are reseller-retailers; however, in the immediate instance the use of the term is ambiguous and one must speculate as to whether the DOE intended to refer only to resellers or to reseller-retailers as well.

*Id.*, at 37318. DOE stated "Although DOE is not proposing a specific amendment regarding the reseller rule, it is DOE's intention to amend the reseller rules if the rulemaking record supports such amendments." *Id.*, at 37319.

On July 3, 1979, DOE announced that the period for public comment on the proposed amendments would be shortened from July 26, 1979, to July 12, 1979, because of the "economic hardships being suffered by retail dealers of motor gasoline." 44 Fed. Reg. 40329 (July 10, 1979). DOE issued emergency regulations on July 15, effective July 16, 1979, which provided that "retailers may not charge a price in a sale of any type or grade of gasoline which exceeds the most recent acquisition cost plus 15.4 per gallon, plus tax costs." 10 C.F.R. § 212.93(a)(2); 44 Fed.Reg. 42541 (July 19, 1979) (the July 15 rule). The amendments also eliminated the banking provisions for unrecouped product costs for retailers. DOE stated that the amendments were necessary because the evidence indicated that "unless retail dealers were permitted promptly an adequate margin to reflect reduced allocations and increased non-products costs, many would go out of business causing severe disruptions and imbalances in the supply and distribution of gasoline." *Id.*, at 42542. DOE also indicated that the comments made clear that there was an urgent need to simplify the rules. *Id.*, at 42541. While the May 15 rule remained in effect for the retail sales of reseller-retailers, DOE stated "[w]ith respect to amendments proposed to retail sales of gasoline by refiners and resellers and the adjustments to reseller allowable margins, DOE is continuing this rulemaking proceedings and intends promptly to issue rules thereon." *Id.* at 42544.

Because reseller-retailers were permitted to continue to use the banking provisions, there were instances in which reseller-retailers could charge prices in retail sales in excess of those allowed to be charged by competing independent retailers. Consequently, on August 1, 1979, DOE issued amendments to the July 15 rule which provided that reseller-retailers were to continue to calculate the MLSP for gasoline under the existing regulations, except that a cap was imposed which limited the maximum price to the most recent acquisition cost, plus 15.4 cents per gallon, plus applicable taxes. 44 Fed.Reg. 45352 (August 1, 1979). DOE stated that these amendments were necessary "to limit refiners' and reseller-retailers' maximum lawful selling prices to an amount approximately equal to retailers' maximum lawful selling prices in order to preserve competition and prevent price gouging and distortions, supply disruptions and dislocations and inflationary price increases." *Id.* At the same time DOE invited comments "on whether further changes to the regulations should be made to prevent their forcing reseller-retailers to charge prices that are significantly below competitive levels and, if so, how such changes should be structured." *Id.*, at 45353.

The preamble to the August 1 amendments noted that any firm adversely affected by the amendment could apply for an exception to such rules. County did not file an application for exception relief until five years after the amendments were promulgated and well after DOE had issued its Remedial Order. The Office of Hearings and Appeals denied the application, *County Fuel Company, Inc.*, 14 DOE 81,015 (1986), and County did not seek review of that denial.

On November 28, 1979, DOE issued a NOPR that proposed to increase the non-product costs recoverable from resales of gasoline and to adopt a price rule for retail sales of reseller-retailers that was similar to the July 15 rule in that it provided for a fixed cents markup and the elimination of banked costs. 44 Fed.Reg. 69602 (December 3, 1979). While the NOPR acknowledged receipt of comments concerning the reseller and reseller-retailer price rules that were submitted after the NOPR issued June 22, 1979, DOE stated, "[c]ommenters should note, however, that information submitted regarding reseller and reseller-retailer margins would, in most part, be inadequate to support a major change in the current price rules for gasoline." *Id.* DOE offered resellers and reseller-retailers

some relief effective on January 1, 1980, by adopting an amendment which increased the amount of unrecovered non-product costs recoverable on resales of delivered gasoline. 45 Fed.Reg. 1582 (January 7, 1980).

On May 1, 1980, DOE issued an amendment to the price regulations which permitted reseller-retailers to choose between the existing price regulations and a fixed cents markup similar to that in effect for retailers. 45 Fed.Reg. 29546 (May 2, 1980). The fixed cents markup provision stated that a reseller-retailer's retail price should be based on its most recent dealer tank wagon price to an independent retailer, plus 16.1 cents per gallon, plus tax costs. DOE noted in its background comments to the May 1 amendments that while the June 22–July 12, 1979 comment period had resulted in amendments applicable only to retailers, DOE had "used the comments received concerning other types of sales to formulate several alternative pricing schemes for sales by resellers and reseller-retailers." Id.

On December 22, 1983, after several initial hearings, DOE issued a Remedial Order which stated that during the relevant audit period (March 1, 1979 through March 18, 1980) County violated the provisions of 10 C.F.R. § 212.93 by selling gasoline in excess of the MLSP, and ordered County to pay for overcharges in the amount of $197,-305.49.[2] The Federal Energy Regulatory Commission affirmed the Remedial Order on August 23, 1985. Thereupon, County instituted this action in the district court. On review of cross-motions for summary judgment, the district court found that DOE's actions were arbitrary and capricious in that all retail sales were not similarly treated under the July 15 rule. The district court stated that the practical effect of DOE's amendment to the regulations was to treat the three seller classifications differently for the first time since the distinction amongst sellers was drawn in 1973.

### III

We believe that DOE acted reasonably under the circumstances. DOE responded quickly and cautiously to a predicament which threatened the viability of independent retail gasoline stations, a major source of gasoline for the public and a significant segment of the nation's petroleum industry. Approximately 90 percent of the 170,-000 retail stations at that time were independently owned and operated. 44 Fed. Reg. at 37316. Operating within a preexisting regulatory scheme that classified firms on the basis of the functions they performed, DOE began with the group most acutely affected by the crisis and continued thereafter to deal with the groups *seriatum*. It is neither arbitrary nor capricious to give immediate relief to those imminently threatened, when a comprehensive review of existing regulations would consume valuable time which the circumstances dictated could ill be afforded.

We believe that DOE adequately considered the factors set forth in 15 U.S.C. § 753(b)(1) and reasonably concluded that it should address the emergency needs of retailers in the most expeditious means available, before addressing the problems encountered by the other seller segments of the petroleum industry. It is clear from DOE's comments that their formula for immediate relief took into consideration the public health, safety and welfare, the preservation of an economically sound and competitive industry, equitable prices among sectors of the petroleum industry, and the minimization of economic distortion. It is also clear that if DOE erred in not addressing the pricing problems of reseller-retailers, it was not "clear" error because DOE's

---

**2.** County admitted that not only did it not calculate its prices according to the July 15 regulations, but also that it did not calculate its prices as if it were a reseller-retailer. (Transcript of United States Department of Energy, Office of Hearings and Appeals, Case No. HRO–0058, pp. 9–10). Nonetheless, County argued for an eq-uitable resolution to its difficulties because it was a small operation which could not afford the auditing expenses necessary to avail itself of the banking provisions and its violations essentially occurred during the period when the existing regulations were being amended.

action was, at the least, an effective means of addressing the exigent circumstances. Nowhere in the record is there evidence which suggests that the viability of reseller-retailers was threatened in any manner similar to the threat faced by independent retailers. A narrowly drafted solution which is directed at the particular problem is a better cure than a panacea which ineptly attempts to address all difficulties before such difficulties are fully understood. Each alternative available to DOE had advantages and disadvantages, and each course of action, whether the adoption of a uniform retail sale rule, further delay and study, or the route chosen, would have a rational basis. Under DOE's course of action, DOE was afforded the opportunity to study the consequences of a fixed cents markup on retail sales of reseller-retailers on competition at the retail level. Consequently, we conclude that DOE's actions withstand the three prong test of *Mobil I, Texaco* and *Bowman.*

This case, however, is somewhat unique because we are asked to decide a question tangential to the issues in a typical suit to ascertain regulatory validity. The typical question in such a suit has been asked by retailers in *Shimek v. Department of Energy,* 685 F.2d 1372 (Temp.Emer.Ct.App. 1981), in which this Court upheld the substantive and procedural validity of the July 15 amendments. In this instance, however, we are not asked to pass on the validity of the DOE amendment, but rather on the failure of DOE to concurrently adopt amendments which similarly treated different segments of the petroleum industry. In other words, given the existing regulatory system of classification and the exigent circumstances caused by the shortage of oil, was it reasonable to adopt an amendment which offered relief to the class most severely affected and delay action for those classifications not as acutely susceptible? We believe that not only was DOE's action reasonable under the circumstances, but that it was also the most pragmatic course. We are not presented with a case in which the litigants are suggesting that the agency involved unreasonably delayed its action. *See, e.g., Telecommunications Research and Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984); *Airline Pilots Associations International v. Civil Aeronautics Board,* 750 F.2d 81 (D.C.Cir.1984). A delay of less than ten months in which to further study the various alternative amendments and the potential impact of such amendments does not suggest an unreasonable delay. Nor does the record suggest that there was any crisis situation facing reseller-retailers during 1979, any particular prejudice in DOE's further considerations of the ramifications of adopting the amendments, or any urging that DOE act more promptly. If relief was necessary to reseller-retailers, the August 1 amendment made exception relief available until evidence could be gathered which supported more comprehensive action.

Consequently, we reverse the district court's grant of summary judgment for County and denial of summary judgment for DOE. Furthermore, because the Remedial Order is supported by substantial evidence of overcharges, it should be affirmed.

REVERSED.