**MOBIL OIL CORPORATION, Exxon Corporation, Gulf Oil Corporation, and Marathon Oil Corporation, Plaintiffs-Appellees,**

v.

**The DEPARTMENT OF ENERGY and James B. Edwards, Defendants-Appellants.**

**and**

**NAPH–SOL REFINING COMPANY, Plaintiff-Appellant,**

v.

**MURPHY OIL CORPORATION, Defendant-Appellee.**

**Nos. 2–40, 6–31.**

Temporary Emergency Court of Appeals.

Argued April 15, 1983.

Decided Dec. 20, 1983.

Rehearing and Rehearing En Banc Denied Feb. 10, 1984.

Certiorari Denied June 18, 1984. See 104 S.Ct. 3545.

David A. Engels, Dept. of Energy, Washington, D.C., with whom Thomas C. Newkirk, Larry P. Ellsworth, Floyd I. Robinson, Thomas A. Schweitzer and Dennis M. Moore, Washington, D.C. were on brief for appellants in No. 2–40.

Donald B. Craven, Miller & Chevalier Chartered, Washington, D.C., with whom Jay L. Carlson, James P. Tuite and Scott E. Pickens, Washington, D.C., Jay W. Wason, Mackenzie, Smith, Lewis, Mitchell & Hughes, Syracuse, N.Y., Barbara Finney, Robert F. Ochs and J. Ronald Sandberg, Houston, Tex., Andrew J. Kilcarr and James P. Shaughnessy, Donovan, Leisure, Newton & Irvine, Washington, D.C., Thomas R. Trowbridge III, Donovan, Leisure, Newton & Irvine, New York City, John M. Freyer, Bond, Schoeneck & King, Syracuse, N.Y., Charles S. Lindberg and Francis A. Rowen, Jr., New York City, Daniel Joseph, Warren E. Connelly and Edward L. Rubinoff, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Donald L. Nicholas, Costello, Cooney & Fearon, Syracuse, N.Y., and John A. Evans, Findlay, Ohio, were on brief for appellees in No. 2–40.

Neva T. Campbell, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., on brief for amici curiae Richard W. Dyke, dba Western Stations Co., Colvin Oil Co. and F.O. Fletcher, Inc., dba Fletcher Oil Co.; Steven Schaars and Joan Goldfrank, Collier, Shannon, Rill & Scott, Washington, D.C., on brief for amici curiae Go-Tane Service Stations, Inc., Kickapoo Oil Co., Inc. and Lake Shore Oil Co.; James F. Flug and Mark Hessel, Lobel, Novins & Lamont, Washington, D.C., on brief for amici curiae Attys. Gen. of Mich., Ala., Ill. and Pa., and the Controller of Cal.; and Charles W. Petty, Jr., Anthony J. Thompson, Charles E. Sliter, Robert F. Reklaitis and Janet E. Pitterle, Hamel, Park, McCabe & Saunders, Washington, D.C., on brief for amicus curiae Growmark, Inc., in No. 2–40.

William H. Bode, Spriggs, Bode & Hollingsworth, Washington, D.C., with whom John E. Varnum and Tobey B. Marzouk, Washington, D.C., were on brief for appellant in No. 6–31.

Daniel Joseph, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., with whom R. Bruce McLean, Edward L. Rubinoff and Phyllis R. Anderson, Washington, D.C., William K. Holmes, Warner, Norcross & Judd, Grand Rapids, Mich., and H.Y. Rowe and W. Bayless Rowe, El Dorado, Ark., of counsel, were on brief for appellee in No. 6–31.

Thomas C. Newkirk, Larry P. Ellsworth, David A. Engels, Floyd I. Robinson, Thomas A. Schweitzer and Dennis M. Moore, Dept. of Energy, Washington, D.C., on brief for amicus curiae The U.S. Dept. of Energy in No. 6–31.

Before METZNER, PECK and LACEY, Judges.

LACEY, Judge.

## INTRODUCTION

The Department of Energy ("DOE") and Naph-Sol Refining Co. ("Naph-Sol") appeal from orders entered by, respectively, the District Court for the Northern District of New York and the District Court for the Western District of Michigan that, *inter alia,* invalidated the "deemed recovery rule" as procedurally defective. *Mobil Oil Corp. v. DOE,* 547 F.Supp. 1246 (N.D.N.Y.1982),[1] is a declaratory judgment action brought to challenge the validity of a "three cent" retail price equalization rule and, alternatively, of the "deemed recovery rule."

---

1. Plaintiffs in *Mobil v. DOE* are Mobil Oil Corporation, Gulf Oil Corporation, Exxon Corporation, and Marathon Petroleum Corporation.

Unless otherwise indicated, a reference to Mobil encompasses all these parties.

*Naph-Sol Refining Co. v. Murphy Oil Corp.*, 550 F.Supp. 297 (W.D.Mich.1982), is an action for recovery of overcharges with respect to Naph-Sol's purchase of gasoline from Murphy Oil Corporation ("Murphy") at prices allegedly in excess of those permitted by the petroleum price regulations, 10 C.F.R. pt. 212, including the "deemed recovery rule," and by the supply contracts existing between the parties. Although, as will become apparent, other issues are also before this court, the invalidation of the "deemed recovery rule" was pivotal to both district court rulings and resulted in the consolidation of these appeals.

### I.  Background

### A.  Regulatory Background

We first survey the various regulations involved, deferring until a subsequent section any detailed presentation of the procedural aspects of the rulemakings here in issue.

#### 1.  Petroleum Price Regulations

Prior to the rulemakings involved here, the Mandatory Petroleum Price Regulations,[2] 10 C.F.R. pt. 212, established limitations on the maximum prices refiners could charge in the sale of "covered products" or of "special products," such as motor gasoline.[3] Under the "price rule," a refiner could "not charge to any class of purchaser a price in excess of the base price" of the covered product except under certain specified conditions. 10 C.F.R. § 212.82 (1975). A "class of purchaser" was defined as "purchasers ... to whom a person has charged a comparable price for comparable property or services pursuant to customary price differentials between those purchasers ... and other purchasers...." 10 C.F.R. § 212.31 (1975). One purpose of these price rules was to maintain the supplier-purchaser relationships as they existed in 1972–73, prior to the statutory regulation of the petroleum industry.

The "base price" was "the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus increased product costs incurred between the month of measurement and the month of May 1973 ...." 10 C.F.R. § 212.82(f)(1)(i) (1975). To calculate its base price for a given month, therefore, a refiner had to: 1) establish its classes of purchaser; 2) compute its increased product costs and apportion these among the various products it sold; and 3) allocate the increased costs for each product among its classes of purchasers of that product.

The "refiner cost allocation formula" governed apportionment of increased product costs.[4] As it operated in January 1974, this

---

**2.** In November 1973, Congress passed the Emergency Petroleum Allocation Act ("EPAA"). Pub.L. No. 93–159, 87 Stat. 628, 15 U.S.C. §§ 751 *et seq.* Pursuant to the statute, the President established the Federal Energy Office ("FEO") and delegated to it the authority to implement the allocation and price stabilization provisions of the EPAA. Exec. Order No. 11748, 38 Fed.Reg. 33575 (Dec. 6, 1973). The FEO adopted and republished without significant alternation the Cost of Living Council's Phase IV petroleum price regulations. 39 Fed. Reg. 744, 761 (Jan. 2, 1974); 39 Fed.Reg. 1924 (Jan. 15, 1974). These were the regulations in existence prior to the adoption of the rules involved in these cases.

On May 7, 1974, the Federal Energy Administration Act ("FEAA") was enacted. Pub.L. No. 93–275, 88 Stat. 97, 15 U.S.C. §§ 761 *et seq.* In June 1974, the President abolished the FEO and replaced it with the Federal Energy Administration ("FEA"). Exec.Order No. 11790, 39 Fed. Reg. 23185 (June 27, 1974). The FEA was a predecessor to the Department of Energy ("DOE"), which was established in 1977, pursuant to the Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 567, 42 U.S.C. §§ 7101 *et seq.* Federal control of the price and allocation of petroleum products was discontinued on January 28, 1981. Exec. Order 12287, 46 Fed.Reg. 9909 (Jan. 30, 1981).

In text, regulations are cited to the first edition of C.F.R. in which they appear. Between 1973 and 1981 some of the regulations underwent amendments not relevant to the challenges in this case.

**3.** "Special products," with which we are concerned, included no. 2 heating oil and 2–D diesel fuel as well as motor gasoline. 10 C.F.R. § 212.31 (1975).

**4.** We consider the rules for "special products." The details of the rules for non-special products are not pertinent here.

A verbal formulation of the "refiner cost allocation formula" is set out in note 5 *infra.*

formula yielded a cents per gallon figure, referred to as "$d_i{}^u$," that represented the maximum amount of increased product cost that a refiner might apportion to a given special product:

> $d_i{}^u$ = the dollar increase that may be applied in the period "u" (the current month) to the May 15, 1973, selling price of the special product . . . to each class of purchaser to compute the base price to each class of purchaser . . . .

10 C.F.R. § 212.83(c)(2) (1975).

The $d_i{}^u$ calculation established the maximum increment of increased product costs a refiner could pass through to each class of purchaser of a particular special product. Since $d_i{}^u$ was a single number, the result of the formula was the equal application of increased product costs among classes of purchasers when the maximum was passed through. This rule was designed to distribute the burden of increased costs as uniformly as feasible.

The Regulations, however, did not require refiners actually to charge the base price. In certain market conditions, refiners might choose to set prices below base price by not immediately passing on some of the increased product costs. Whether, as of January 15, 1974, refiners were obligated to pass through increased product costs equally to each class of purchaser when selling prices were below base price is a matter in issue.

As noted, the Regulations did not require a refiner to recover all of its increased

product costs for a given month in that month. The "cost bank rule," 10 C.F.R. § 212.83(e)(1) (1975), allowed the refiner to carry over, or "bank," its unrecovered increased product costs for inclusion in the calculation of base prices in a later month:

> (e) Carryover of costs. (1) If in any month . . . a firm charges prices for a special product which result in the recoupment of less total revenues than the entire amount of increased product costs calculated for that product pursuant to the general formula . . . the amount of increased products costs not recouped may be added to the May 15, 1973 selling prices to compute the base prices for that special product for a subsequent month.

Whenever a refiner added previously unrecouped costs to its current price, of course, it had to reduce its "bank" of these costs.[5]

In addition, the refiner could add to the base price certain increases in *non*-product costs incurred since May 1973 but only if the refiner satisfied certain profit margin limitations and complied with a prenotification procedure that required advance notice of the proposed price increase to the agency for its approval. 10 C.F.R. § 212.87 (1975). The sum of the base price and allowable nonproduct cost increases was the refiner's maximum lawful price.

### 2. *April 1974 Three-Cent Rule*[6]

The "retail price equalization," or "three-cent," rule, promulgated in April 1974, was a response to an unintended price disparity that had developed between independent and refiner-operated gasoline stations. *See* 39 Fed.Reg. 12013, 13013–14 (April 2, 1974).

---

**5.** This carried over unrecouped cost was part of the calculation in figuring the numerator in the formula for $d_i{}^u$. In verbal form, the $d_i{}^u$ formula was as follows:

$$d_i{}^u = \text{``u''} \times \frac{\begin{array}{c}\text{total cost}\\\text{of crude}\\\text{in period}\\\text{including}\\\text{period ``u'' of}\\\text{previous year}\end{array}}{\begin{array}{c}\text{total volume}\\\text{of covered}\\\text{products sold}\\\text{in that}\\\text{period}\end{array}} \times \frac{\begin{array}{c}\text{total volume}\\\text{of gasoline}\\\text{sold in 3}\\\text{month period}\end{array}}{1} + \frac{\begin{array}{c}\text{total}\\\text{increased}\\\text{costs of}\\\text{purchased}\\\text{gasoline in}\\\text{period ``u''}\end{array}}{1} + \frac{\begin{array}{c}\text{banked}\\\text{increased}\\\text{costs}\\\text{attrib-}\\\text{utable to}\\\text{gasoline}\end{array}}{1} = \frac{\begin{array}{c}\text{increased}\\\text{product}\\\text{costs}\\\text{allocable to}\\\text{gasoline}\\\text{that a}\\\text{refiner had}\\\text{allocated to}\\\text{other}\\\text{products}\end{array}}{1}$$

the volume of gasoline that the refiner estimates that it will sell in the current month "u"

*See* 10 C.F.R. § 212.83(c)(2)(i) (1975).

**6.** This rule, the "old" three cent rule, and the May 1977 three cent rule, the "new" three cent rule, are relevant to *Mobil v. DOE*, but play no part in the *Naph-Sol v. Murphy Oil* appeal.

In January and February 1974, the FEO authorized independent and refiner-operated retailers of motor gasoline to increase their retail selling prices by up to three cents a gallon to reflect increases in nonproduct costs incurred in the marketing of gasoline. *See* 39 Fed.Reg. 809 (Jan. 3, 1974); 39 Fed.Reg. 7795 (Feb. 28, 1974). Since refiner-operated stations were subject to profit margin and pre-notification restrictions, however, they generally did not attempt to recover the three cent marketing cost allowance. As a result, independents were faced with either foregoing the three cent allowance or being undersold by the refiner-operated stations.

FEO responded by promulgating an amendment to the refiner cost allocation formula for calculating $d_i{}^u$:

$d_i{}^u$ = The dollar increase that may be applied in the period "u" (the current month) to the May 15, 1973 selling price of [a special product] to each class of purchaser to compute the base price to each class of purchaser, except that the dollar increase that may be applied in the period "u" to the May 15, 1973 selling price of gasoline to compute the base prices to the classes of purchaser which purchase gasoline at retail from a refiner at service stations operated by employees of the refiner may be "$d_i{}^u$" plus a maximum of $.03 per gallon of gasoline provided that, in computing "$d_i{}^u$," the numerator of the [general formula] is reduced by an amount equal to the product of the actual amount of cents per gallon increase added to "$d_i{}^u$" above multiplied by the estimated number of gallons of gasoline to be sold during the period "u" at retail through service stations operated by employees of the refiner.

10 C.F.R. § 212.83(c)(2) (1975), 39 Fed.Reg. 12013 (April 2, 1974).

The three cent rule thus allowed refiners to pass through an additional three cents per gallon of increased product costs in sales of motor gasoline at refiner-operated stations. The rule, however, did not increase the total amount of increased product costs a refiner could recover. The refiner had to subtract the dollar amount recovered under the three cent rule from the amount of increased product costs otherwise available for recovery under $d_i{}^u$.[7]

### 3. *Deemed Recovery Rule*

In September 1974, without prior notice or opportunity for comment, and in reliance on the "good cause" exception to this procedural requirement, *see* 5 U.S.C. § 553(b)(B), the FEA promulgated an amendment to the cost bank rule. 39 Fed.Reg. 32306 (Sept. 5, 1974). The amendment, addressing a supposed "ambiguity" in the Regulations and directed to preserving "customary price differentials," *id.* at 32307, made explicit that the requirement that refiners pass through increased product costs equally among classes of purchaser applied to actual, and not just maximum, selling prices. It also provided for a "deemed recovery" penalty should actual prices not reflect equal application of costs:

§ 212.83. Allocation of refiner's increased costs.

.　　.　　.　　.　　.

(e) *Carryover of costs.*

(1) . . . With respect to each special product . . . when a firm calculates the amount of increased product costs not recouped, which may be added to the May 15, 1973 selling prices to compute the base prices for that special product in a subsequent month, it shall calculate its revenues as though the greatest amount of increased product costs actually added to any May 15, 1973 selling price of that special product and included in the price charged to any class of purchaser, had been added, in the same amount, to the May 15, 1973 selling price of that special product and included in the price charged to each class of purchaser; except that, where an equal amount of increased product cost is not included in the price charged to a purchaser because of a price term of a written contract covering the sale of such product which was entered

---

7. Thus, "the cents per gallon increase added to the retail price for gasoline multiplied by the estimated number of gallons to be sold in the period 'u'," was a separately computed term, to be subtracted from the numerator of the $d_i{}^u$ formula set forth in note 5 *supra*.

into on or before September 1, 1974, that portion of the increased product costs not included in the price charged to such a purchaser need not be included in the calculation of revenues.

10 C.F.R. § 212.83(e)(1) (1975).

Under the deemed recovery rule, then, the refiner had to pass through increased product costs uniformly among all classes of purchaser or suffer a cost recovery penalty. Specifically, each month the refiner was required to compute its bank of unrecovered costs as though it had charged *all* classes of purchaser the largest increment of increased costs it charged to any one class of purchaser, even though, in fact, it did not. If a refiner applied increased costs unequally, thus, it had to reduce its bank of previously unrecouped costs by an amount that was larger than the amount of increased costs actually recouped. The refiner, that is, was "deemed" to have recovered costs it, in fact, did not. By penalizing selective price increases, therefore, the deemed recovery rule provided an economic incentive for equal pass through of increased product costs in actual selling prices.

In the September 5, 1974 rulemaking, the FEA stated that it intended to hold public hearings regarding proposed revisions to the Regulations and that, at that time, it would receive comments on the deemed recovery amendment. 39 Fed.Reg. at 32307. On September 10, 1974, the FEA published a notice of a proposed "comprehensive revision" of the Regulations. 39 Fed.Reg. 32718 (Sept. 10, 1974). The proposed revisions included certain modifications of the rules governing equal application of increased product costs and the recoupment of unrecovered increased product costs. *Id.* at 32718–24. The FEA received oral and written comments on the proposed revisions. On December 5, 1974, the FEA repromulgated the deemed recovery rule in its September 5, 1974 form. 39 Fed.Reg. 42368, 42372 (Dec. 5, 1974).

### 4. *May 1977 Three Cent Rule*

On January 27, 1977, the FEA published various amendments affecting the pricing of gasoline. One change modified the definition of $d_i^u$, altering it from a cents per gallon figure to a total dollar figure of increased product costs that a refiner could allocate to a given product. 42 Fed.Reg. 5030, 5031 (Jan. 27, 1977). This new definition did not contain the three cent retail price equalization rule that had been introduced into the definition of $d_i^u$ in April 1974.

On May 5, 1977, without prior notice or opportunity for comment, and in reliance on the interpretive rule exemption to this procedural requirement, *see* 5 U.S.C. § 553(b)(A), the FEA published a "corrective amendment" to the price rule to replace the "inadvertently omitted" three cent rule:

§ 212.83 Price Rule ...

(h) *Equal Application among classes of purchaser* ...

(2) *Special Rules* ...

(iv) Retail sales of gasoline by refiners. When a refiner calculates the amount of increased costs not recouped that may be added to May 15, 1973, selling prices of gasoline to compute maximum allowable prices in a subsequent month, it may, notwithstanding the general rule in paragraph (b)(1) of this section, compute revenues as though (A) the greatest amount of increased costs actually added to any May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser that purchases gasoline at retail from a refiner at any service station operated by employees of the refiner had been added to the May 15, 1973, selling price of gasoline and included in the price charged to any class of purchaser that purchases gasoline at retail from a refiner at any service station operated by employees of the refiner had been added, in the same amount (less any actual differential or three cents per gallon, whichever is less) to the May 15, 1973 selling prices of gasoline and included in the price charged to all other classes of purchaser.

10 C.F.R. § 212.83(h)(2)(iv) (1978), 42 Fed. Reg. 22881 (May 5, 1977).

The FEA indicated that this new three cent rule was merely making explicit the equal application requirement, and deemed recovery penalty, that was implicit in the original three cent rule. *Id.*[8]

In March 1978, Mobil filed a request for a formal interpretation of the three cent rule. The FEA ruled that, since its inception in April 1974, the three cent rule was but a "limited" exception to the equal application requirement. Although it permitted unequal recovery of increased product costs as between retail classes of purchaser of motor gasoline as a group and all other classes of purchaser of gasoline, it did "not authorize any price variations between individual refiner owned stations without penalty." *Mobil Oil Corp.,* Interp. no. 78–53, 43 Fed.Reg. 40207 (Feb. 11, 1978), 6 En.Mgmt. [CCH] ¶ 56,444 (1978). *See Atlantic Richfield Co.,* Interp. 78–36, 43 Fed.Reg. 29541 (June 9, 1978), 6 En.Mgmt. [CCH] ¶ 56,427 (1978).

In the FEA's view, therefore, whenever, under the three cent rule, a refiner passed through $.03 of increased product costs to any one refiner-operated gasoline station, it would be deemed to have passed through the full $.03 to all refiner-operated stations even though, in fact, it did not.[9]

### B. *Proceedings in the District Courts*

In January 1979, Mobil brought an action challenging the validity of the new three cent rule and, alternatively, of the September 1974 deemed recovery rule. Mobil's position was that by reading an equal application requirement and deemed recovery penalty into the three cent rule, at least among individual refiner operated stations, the new three cent rule did not merely interpret the Regulations but substantively changed them. Accordingly, since the FEA did not follow notice and comment proce-

dures in promulgating it, the new three cent rule was procedurally defective.

Mobil maintained that, under the rule as promulgated in April 1974, there was no requirement that recovery of the three cent allowance be uniform among classes of purchaser or among refiner operated gasoline stations. Mobil further argued that the September 5, 1974 deemed recovery rule applied only to the $d_i{}^u$ increment and not to recovery of the three cent allowance. Should the district court have been inclined to a different view of the effect of the September deemed recovery rule on the three cent rule, Mobil, in the alternative, argued that the deemed recovery rule itself was procedurally invalid.

In the district court, the DOE pressed the position that the September deemed recovery rule by its terms applied to *all* increased product costs passed through in actual selling prices, including the three cent allowance. Thus, whether the three cent rule contained an equal application requirement and imposed a deemed recovery penalty in April 1974 *vel non,* it did so in September 1974. The 1977 rule, therefore, was merely an interpretive elaboration of the existing regulatory scheme. The DOE additionally maintained that the deemed recovery rule was validly promulgated in September 1974 under the "good cause" exception, and, further, validly repromulgated in December 1974.

The district court agreed with Mobil that, as promulgated in April 1974, the three cent rule "contained no equal application requirement pertaining to the pass-through of increased product costs ...." *Mobil v. DOE, supra,* 547 F.Supp. 1246, 1270. See *id.* at 1266. The district court, however, never ruled on the impact of the September 1974 deemed recovery rule on the April 1974 three cent rule. Rather, the court invalida-

---

**8.** In this regard, it is notable that the original three cent rule was located in the section setting forth the refiner cost allocation formula ($d_i{}^u$), 10 C.F.R. § 212.83(c) (1975), while the new three cent rule was placed into the then-existing equal application provisions in the Regulations, 10 C.F.R. § 212.83(h) (1978).

**9.** In this view, the deemed recovery rule would apply to the last term in the numerator of the $d_i{}^u$ formula, the three cent rule term, *see* notes 5 & 7 *supra,* such that refiners would be subject to a cost recovery penalty if they passed through the three cent cost allowance unequally among refiner-operated gas stations.

ted the deemed recovery rule as procedurally defective.

The court found there was no emergency in September 1974 justifying the FEA's bypass of the notice and comment procedures. *Id.* at 1268–69.[10] The court also rejected the argument that the deemed recovery rule was validly repromulgated in December 1974, finding that the September 10, 1974 notice of proposed rulemaking was inadequate to inform interested parties that the agency was evaluating the deemed recovery rule *de novo. Id.* at 1269.

Since there was no equal application requirement inherent in the April 1974 three cent rule and the September 1974 deemed recovery rule was procedurally invalid and, thus, a nullity, the May 1977 three cent rule effected a substantive change in the Regulations. Since the FEA promulgated this rule without following notice and comment procedures, it, too, was procedurally invalid. For these reasons, the district court entered summary judgment in favor of Mobil.

In January 1979, Naph-Sol brought an action to recover price overcharges allegedly incurred in its purchase of refined petroleum product from Murphy Oil Corp. Naph-Sol's claim that Murphy's prices were in excess of the maximum allowed under the Petroleum Price Regulations was, principally, two fold.[11]

First, Naph-Sol alleged that the price that Murphy charged on May 15, 1973 was in excess of that permitted by the parties' supply contract and, therefore, that Murphy used an unlawful May 15 price in calculating its maximum allowable price under the Regulations.

Second, Naph-Sol contended that Murphy computed its selling prices in violation of the equal application and deemed recovery requirements. Thus, Naph-Sol claimed that Murphy passed through increased product costs unequally and then computed its cost bank without regard to the deemed recov-

ery principle. Murphy thereby calculated its prices to purchasers as though banked, unrecouped cost increases were available to be passed through when, under the deemed recovery rule, they were not. This resulted in overcharges to purchasers, of whom Naph-Sol was one.

On September 17, 1982, the district court granted summary judgment in favor of Murphy on the unlawful May 15 selling price claim and, on October 1, 1982, it granted summary judgment to Murphy on the deemed recovery rule violation claim. The district court ruled, as a matter of law, that the price Murphy charged Naph-Sol on May 15, 1973 was permissible under the supply contracts between the parties. There was, therefore, no contractual violation and, consequently, no regulatory violation. *Naph-Sol v. Murphy Oil Corp., supra,* 550 F.Supp. at 305–06.

The court also invalidated the deemed recovery rule on procedural grounds. The court found that no emergency existed in September 1974. *Id.* at 322–23. Additionally, the court held that the deemed recovery rule was not validly repromulgated since the December 5, 1974 publication did not include an adequate statement of the basis and purpose for retaining the rule. *Id.* at 323–24. This ruling effectively disposed of Naph-Sol's claim that it was entitled to recover for overcharges due to Murphy's violation of the deemed recovery rule.

## II. *Standard of Review*

The judicial review provisions of § 211(d)(1) of the Economic Stabilization Act, 12 U.S.C. § 1904 note, which were incorporated into the Emergency Petroleum Allocation Act by 15 U.S.C. § 754(a)(1), limit the scope of our review to a determination of whether regulations were issued in excess of agency authority, are arbitrary or capricious, or otherwise not in accordance with law under the criteria set forth in 5

---

**10.** We will consider the procedural arguments in detail in Part IV *infra.*

**11.** Naph-Sol's complaint also contained other allegations of regulatory and contractual viola-

U.S.C. § 706(2).[12] The relevant provisions of 5 U.S.C. § 706(2) are:

> The reviewing court shall—
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .
>
> .    .    .    .    .
>
> (D) without observance of procedure required by law . . . .

■ The Supreme Court, drawing on its earlier decisions in *Bowman Transportation Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), and *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), has recently summarized the appropriate scope of review under the arbitrary and capricious standard:

> The scope of review . . . is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

*Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (citation omitted). A reviewing court, thus, may not set aside an agency rule that is the product of reasoned decisionmaking, based on consideration of relevant factors, and within the scope of the authority delegated to the agency by statute. *See id.* at 2866, 2871. This court has followed the "rational basis" test. *See McCulloch Gas Processing Corp. v. DOE,* 650 F.2d 1216, 1221 (TECA 1981) (citing cases).

■ An agency's procedural compliance with statutory norms, however, is subject to closer scrutiny. The reviewing court, having competence in this area, must satisfy itself that there was procedural integrity in the promulgation of the regulations in question. *See ITT World Communications v. FCC,* 699 F.2d 1219, 1246 (D.C.Cir.1983); *National Resources Defense Council v. SEC,* 606 F.2d 1031, 1048 (D.C.Cir.1979); *Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1027 (D.C.Cir.1978). Nevertheless, although a court may exercise greater independent judgment when reviewing agency action on procedural, rather than substantive grounds, *see id.,* to the extent that the requisite procedures involve factual determinations, deference is still afforded to agency judgments. *See Philadelphia Citizens in Action v. Schweiker,* 669 F.2d 877, 886 (3d Cir.1982) ("good cause" determination); *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 458 (E.D.Mich.1982) (same). The ultimate question remains whether or not the agency's action was arbitrary and capricious, that is, unreasonable. *See ITT v. FCC, supra,* 699 F.2d at 1246; *Philadelphia Citizens v. Schweiker, supra,* 669 F.2d at 886; *NRDC v. SEC, supra,* 606 F.2d at 1050.

■ Since we review the agency's actions on the identical basis as did the district courts, our review need accord no particular deference to the district courts' conclusions as to whether the administrative record does or does not support the administrative determination as reasonably based. *See Louisiana Environmental Society v. Dole,* 707 F.2d 116, 118 (5th Cir.1983); *Committee for An Independent P–I v. The Hearst Corp.,* 704 F.2d 467, 472 (9th Cir.1983); *Brown v. United States Dep't of the Interior,* 679 F.2d 747, 748–49 (8th Cir.1982); *Philadelphia Citizens v. Schweiker, supra,* 669 F.2d at 886 n. 10. We are free to make an independent determination of the legal question as to whether the agency has made

---

tions. These other counts are not relevant to the present appeal.

**12.** The "substantial evidence" test mentioned in § 211(d)(1) of the ESA, 12 U.S.C. § 1904 note, expressly applies only to agency orders and not, as is the case here, to the issuance of regulations by means of informal rulemaking. *See McCulloch Gas Processing Corp. v. DOE,* 650 F.2d 1216, 1221 n. 7 (Temp.Emer.Ct.App. [hereinafter TECA] 1981).

a showing of good cause. *See Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1171 (6th Cir.1983); *Washington State Farm Bureau v. Marshall,* 625 F.2d 296, 306 (9th Cir.1980). *See also Reeves v. Simon,* 507 F.2d 455, 458–59 (TECA 1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975).

### III. *Laches*

Initially, however, we must address DOE and Naph-Sol's contention that these 1979 challenges to the procedural validity of the 1974 deemed recovery rule are barred by laches. The district court in *Mobil v. DOE* considered and rejected the argument:

> Inasmuch as the focus of this action is upon the May 5, 1977 three cent rule, and in view of the relatively brief period of time between the issuance of the rule and the commencement of this action ... this Court is not inclined to dismiss this action on the ground of laches.

547 F.Supp. at 1265. Although we recognize that laches is an equitable defense addressed to the sound discretion of the trial judge, *see, e.g., Moore v. Smith,* 694 F.2d 115, 119 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1442, 75 L.Ed.2d 798 (1983); *University of Pittsburgh v. Champion Products,* 686 F.2d 1040, 1045 (3d Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *Dickey v. Alcoa Steamship Co.,* 641 F.2d 81, 82 (2d Cir.1981), we cannot uphold the *Mobil* court's laches ruling.

By asking the district court to declare the 1974 deemed recovery rule invalid on procedural grounds, Mobil shifted the "focus" of this action. This is no less true because Mobil's challenge to the validity of the 1974 rule remains embedded within its challenge to the validity of the 1977 rule. The "focus" might reasonably be said to be the 1977 rule if this action involved merely the proper interpretation of the 1974 rule. Mobil, however, moved the case considerably

beyond this.[13] Moreover, there is no logical stopping place to the district court's "focus" analysis. New rules typically build on existing ones and an action to declare a current rule invalid could always be cast, in the alternative, as a challenge to the longstanding rule on which the new rule is premised. Under the district court's reasoning, since the "focus" would be on the new rule, laches could never bar the challenge to the old rule, no matter how untimely, or how prejudicial to the defendant. This argument ignores the basic equitable precepts that laches reflects and, as well, would seriously undermine administrative stability. It cannot be sustained.

Mobil, however, also urges that laches is not available in a "defensive" declaratory judgment action like that here. Mobil argues as follows. Statutes of limitations, and laches, do not run against defenses. Mobil therefore would be able to assert the procedural invalidity of the deemed recovery rule in an enforcement action brought by the DOE. Although nominally the "plaintiff" in the pre-enforcement declaratory judgment action now before the court, Mobil must be viewed in the context of its being the defendant in an enforcement action. Since DOE cannot raise laches in an enforcement action, it should not be permitted to raise laches in a declaratory judgment action seeking only to establish the validity of a defense to the anticipated enforcement action.

It is true that laches, and statutes of limitations, do not run against a defense. *See, e.g., 118 East 60th Owners v. Bonner Properties,* 677 F.2d 200, 203 (2d Cir.1982); *Northern Pacific Ry. Co. v. United States,* 277 F.2d 615, 623–24 (10th Cir.1960); these doctrines are available " 'only as a shield, not as a sword.' " *Id.* at 623–24 (citations omitted). There is little authority, however, on the question whether a declaratory judgment plaintiff like Mobil can, for these

---

**13.** Although the DOE did draw attention to the deemed recovery rule, it was Mobil, both in its complaint, *see* Stip.Record pp. 000021–22, and in its motion for summary judgment, *see id.* pp. 000235–310, that put the question of the validi-

ty, as opposed to the interpretation, of this rule into issue. Absent this, the district court would not have ruled on the validity of the deemed recovery rule.

purposes, be assimilated to the status of a defendant; what there is suggests that it may not.

Thus, in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), which held that a pre-enforcement action for declaratory relief could be entertained by the courts if ripeness and exhaustion requirements were met, the Supreme Court stated:

> Further, the declaratory judgment and injunctive remedies are equitable in nature, and other equitable defenses may be interposed.... The defense of laches could be asserted if the Government is prejudiced by a delay.

*Id.* at 155, 87 S.Ct. at 1519 (citations omitted). One district court, in part relying on *Abbott,* has held that a pre-enforcement declaratory judgment action challenging the validity of the deemed recovery rule was properly characterized as "affirmative" in nature:

> [P]laintiff has had a claim for relief ripe from the institution of the regulations. That claim when it became ripe was not defensive in nature, but affirmative.... Without regard to the institution of administrative enforcement proceedings, plaintiff has had an equitable claim for relief since 1974. The interposition of the administrative proceedings does not alter the affirmative nature of this claim.

*United Refining Co. v. DOE,* Civ. No. 79–144, slip op. at 4–5 (W.D.Pa.1983). Laches therefore was available to the DOE.[14]

We find it particularly difficult to view Mobil's challenge to the deemed recovery rule as "defensive." Mobil, presumably, anticipates being a defendant in an action to enforce the 1977 three cent rule and, thus, aims preemptively to establish the nonenforceability of that rule. Mobil's declaratory judgment action, however, goes considerably further: it challenges the validity of a rule other than the one whose enforcement

is, ostensibly, impending. Although the 1974 deemed recovery rule might somehow be related to the 1977 rule, in these circumstances it would be stretching concepts far too thin to characterize Mobil's challenge to the deemed recovery rule as defensive, or to consider Mobil only "nominally" a plaintiff.

■ Accordingly, since it is clear that laches can be invoked against a declaratory judgment plaintiff who affirmatively challenges an agency rule, *see, e.g., Citizens and Landowners Against the Miles City/New Underwood Powerline v. Secretary of DOE,* 683 F.2d 1171, 1175 (8th Cir.1982); *Independent Bankers Assoc. v. Heimann,* 627 F.2d 486, 487 (D.C.Cir.1980); *Michigan v. City of Allen Park,* 501 F.Supp. 1007, 1016–18 (E.D. Mich.1980) (counterclaim); *cf. Energy Cooperative Inc. v. DOE,* 659 F.2d 146 (TECA 1981) (exhaustion of remedies), we find that laches is available to the DOE.

■ Laches reflects the principle that "equity aids the vigilant, not those who slumber on their rights." *Gull Airborne Instruments v. Weinberger,* 694 F.2d 838, 843 (D.C.Cir.1982), quoting 2 J. Pomeroy, *Equity Jurisprudence* § 418 (5th ed. 1941). Two elements are essential to a laches defense: 1) inexcusable delay in instituting suit; and 2) prejudice to the defendant from such delay. *See, e.g., Gulf Airborne, supra,* 694 F.2d at 843; *University of Pittsburgh v. Champion Products, supra,* 696 F.2d at 1044.

■ Many of DOE's arguments with respect to delay and prejudice, on their face, are impressive. First, and most significantly, is the obvious fact that Mobil's procedural challenge is brought some five years after the fact of promulgation. Mobil and other oil companies promptly challenged other regulations issued at essentially the same time as the deemed recovery rule and there has been no satisfactory explanation

---

14. In an earlier ruling, relied on by Mobil here, the district court had speculated that laches might not be available. *See United Refining Co. v. DOE,* 4 Energy Mgmt. (CCH) ¶ 26,264 (W.D.Pa.1980). Upon further reflection, however, the court held to the contrary.

The other case relied on by Mobil, *Luckenbach Steamship Co. v. United States,* 312 F.2d 545 (2d Cir.1963), involved a statute of limitations, not laches, and in any event, plainly sought only a simple declaration of non-liability for payments allegedly due.

of why, in this case, there was a delay. This is particularly significant here since the judicial review provision in § 211 of the Economic Stabilization Act, 12 U.S.C. § 1904 note, was expressly designed to ensure prompt review of agency action. *See* S.Rep. No. 92–507, 92nd Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Ad. News 2283, 2292–93.

The apparent effects of the delay are considerable. DOE would now be unable to cure any procedural infirmity by repromulgating the deemed recovery rule. It is arguable that invalidation at this juncture would run afoul of congressional intent with respect to petroleum pricing in the period of controls. There is some evidence that Congress never explicitly enacted equal application legislation because, in part, the deemed recovery rule existed. *See* S.Rep. No. 94–26, 94th Cong., 1st Sess. 37–38 (1975). Moreover, invalidation could be seen as prejudicing those refiners who had set their prices in accordance with the rule. Finally, the lost time and expense of DOE's ongoing enforcement actions is to be considered.[15]

Nevertheless, we cannot decide the merits of the laches defense on the present record. All else being equal, we would be inclined to remand the case for factual findings on the question of delay and prejudice. In view of the *Naph-Sol v. Murphy* appeal, however, we would not thereby be relieved of the responsibility of deciding the merits of the procedural validity of the deemed recovery rule.

Murphy raised its challenge to the validity of the deemed recovery rule as a defense to Naph-Sol's claim that it was overcharged due to Murphy's violation of the rule.[16] Although we recognize that this suit, unlike an ordinary contract action, implicates a regulatory scheme and not simply the rights of the parties, we believe that Murphy's

challenge falls within the rule that laches does not run against a defense. Naph-Sol cannot both seek to recover payments and bar Murphy from defending by challenging the statutory basis upon which the claim for recovery is based. Murphy's procedural challenge, thus, cannot be barred by laches; the *Naph-Sol* appeal, therefore, cannot be decided on laches grounds. In view of this, and given our view of the deemed recovery rule issue, we proceed to decide both cases on the merits.

## IV. *Validity of the Deemed Recovery Rule*

Before considering the validity of the deemed recovery rule, the subject matter of this section, one further issue, relevant to the *Mobil v. DOE* appeal, must be addressed. DOE's 1978 Interpretations of the three cent rule seemingly found that an equal application requirement, with a deemed recovery component, was inherent in the original April 1974 rule. If this were true, the May 1977 three cent rule could be upheld as an interpretive rule whether or not the September 1974 deemed recovery rule was valid. The district court, interpreting the language of the original three cent rule, and relying on this court's decision in *Standard Oil Co. v. DOE,* 596 F.2d 1029, 1040–45 (TECA 1978), held that the April 1974 three cent rule did not, of its own force, require that the three cent cost allowance be equally applied. In reaching this result, the court gave little weight to the agency interpretations to the contrary. 547 F.Supp. at 1266–67.

The DOE apparently has abandoned the position that an equal application requirement was implicit in the original three cent rule. Its brief on appeal makes no mention of the argument and, indeed, its summary judgment brief in the district court renounces it. *See* Stip. Record p. 000777. In

---

**15.** Interestingly, in a separate action, Mobil invoked and apparently defended the deemed recovery rule to avoid liability under a New York statute. *See Mobil Oil Corp. v. Tully,* 499 F.Supp. 888, 904–07 (N.D.N.Y.1980), *aff'd,* 653 F.2d 497 (TECA 1981), 639 F.2d 912 (2d Cir. 1981), *vacated and remanded on other grounds,*

455 U.S. 245, 102 S.Ct. 1047, 71 L.Ed.2d 120 (1982).

**16.** On appeal, Naph-Sol urges that Murphy's challenge is barred by laches, relying on essentially the same arguments with respect to delay and prejudice as does the DOE.

view of this, and based on our reading of the regulations as of April 1974, we find it unnecessary to expand on the district court's analysis of this issue, which we adopt. Accordingly, the May 1977 three cent rule cannot be upheld as an interpretive rule without a consideration of the impact of the deemed recovery rule on it. We therefore finally turn to the question of the procedural validity of the deemed recovery rule.

### A. *September 5, 1974 Rulemaking: Good Cause Exception*

The notice and comment procedures of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.,* and the Federal Energy Administration Act (FEAA), 15 U.S.C. §§ 761 *et seq.,* applied to FEA's September 5, 1974 promulgation of the deemed recovery rule. The FEA did not observe these requirements, relying on the "good cause" exceptions in each act.

Under the APA, an agency may promulgate a rule without prior notice and comment

> when the agency for good cause finds (and incorporates the finding in a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest.

5 U.S.C. § 553(b)(B). Under the stricter FEAA requirements, notice and comment

> may be waived where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation, or order.

15 U.S.C. § 766(i)(1)(B).

▮▮▮ Notice and comment procedures afford interested parties a meaningful opportunity to participate in the rulemaking process and assure that an agency's decisions will be informed and responsive. *See, e.g., McCulloch Gas Processing Corp. v. DOE, supra,* 650 F.2d at 1221; *Mobil Oil Corp. v. DOE,* 610 F.2d 796, 802 (TECA 1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *State of New Jersey v. EPA,* 626 F.2d 1038, 1045 (D.C.Cir. 1980). Accordingly, exceptions to § 553

will be "narrowly construed and only reluctantly countenanced." *Id.; accord* S.Rep. No. 752, 79th Cong., 1st Sess. 16 (1945); *Kollett v. Harris,* 619 F.2d 134, 145 (1st Cir.1980); *Sharon Steel Corp. v. EPA,* 597 F.2d 377, 379–80 (3d Cir.1979); *National Nutritional Foods Ass'n v. Kennedy,* 572 F.2d 377, 384–85 (2d Cir.1978). Courts will closely examine the agency's proffered rationale, *see National Federation of Federal Employees v. Devine,* 671 F.2d 607, 610 (D.C.Cir.1982) (per curiam); *Mobil Oil Corp. v. DOE, supra,* 610 F.2d at 804, but may uphold a finding of good cause justified by obvious and compelling facts that can be judicially noticed. *See National Helium Corp. v. FEA,* 569 F.2d 1137, 1141–46 (TECA 1977); *Nader v. Sawhill,* 514 F.2d 1064, 1068 (TECA 1975). The waiver provision of the FEAA is similarly to be used sparingly. *See* Sen.Conf.Rep. No. 93–788, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. Code Cong. & Ad.News 2939, 2977. Despite the narrowness of the exceptions, we are persuaded that FEA had "good cause" for promulgating the deemed recovery rule without prior notice and opportunity for comment.

The preamble to the deemed recovery rule explained that the amendment was intended to clarify an "ambiguity" in the Regulations by putting

> all sellers ... expressly on notice that prices actually charged, and not merely prices calculated as a lawful maximum, must reflect the equal application of increased product costs, except where a pre-existing contract prevents the implementation of such a price.

39 Fed.Reg. 32306, 32307 (Sept. 5, 1974). Although "most sellers" had been equally applying costs in prices below base prices,

> (a)s an improved supply situation has begun to have a restraining influence on prices, the FEA has become aware that certain sellers have taken the position that they may selectively 'bank' increased product costs as to certain classes of purchaser, for recoupment in a subsequent month, as long as the prices charged to

other classes of purchaser do not exceed the maximum lawful price.

*Id.* Such practices "could obviously serve to avoid the intent of the overall framework of the price regulations," particularly the goal of preserving the "customary price differentials" among classes of purchaser. *See id.* The deemed recovery rule was designed to prevent this.

The FEA promulgated the rule without prior notice and comment, finding that an emergency existed and explaining that:

[A]s the supply situation becomes more favorable, the incentive to depart from the equal application requirement becomes stronger. Moreover, announcement of these amendments as proposals would highlight current ambiguities in the regulations and could result in sellers seeking to take advantage of that ambiguity or of the contract exception to the regulation.

The FEA has determined that the continuation or initiation of such practices would be injurious to the public welfare, in view of the number of circumventions of FEA regulations and the substantial compliance difficulties which would result.

According to appellants, then, the FEA feared that highlighting the gap in the Regulations through advance notice would promote discriminatory pricing against independent distributors and, as well, against certain regions of the country, particularly the Northeast. By passing through proportionately greater costs to independent outlets, for instance, refiners could threaten the competitive viability of the indepen-

dents. Moreover, there was a risk that refiners would seek to take advantage of the "contract exception" [17] to the deemed recovery rule and "grandfather in" unequal cost pass-throughs to refiner operated stations by entering into long-term contracts. Thus, advance notice would result in severe market dislocations and erosion of the class of purchaser scheme so central to the Price Regulations, thereby justifying waiver of notice and comment procedures.

Both district courts rejected this argument, finding that the circumstances did not warrant dispensing with notice and comment procedures:

Here, there was no compelling circumstances surrounding the discriminatory pricing practices cited by the agency. No users had been totally deprived of a supply of motor gasoline, no violence had surfaced or appeared imminent, and, more importantly, no sudden, disruptive change appears to have occurred with respect to either the distribution or pricing of motor gasoline on or about the time the September 5, 1974 rule had issued.

*Mobil v. DOE, supra,* 547 F.Supp. at 1269; *accord Naph-Sol v. Murphy Oil, supra,* 550 F.Supp. at 323.[18] We disagree, both as a matter of law and fact.

"Good cause" is most typically found when circumstances pre-existing the rulemaking call for immediate agency response and waiver is required to accomplish the necessary speed. *See generally* K. Davis, *Administrative Law Treatise* § 6.29 (Supp. 1982).[19] Although it is not free from doubt,

---

**17.** This exception permitted unequal application of increased product costs when existing contracts required refiners to sell product to customers at a price below that the refiner was charging to other classes of purchaser.

**18.** "In the present case, there were no compelling circumstances surrounding the discriminatory pricing practices.... In September of 1974, there was no apparent disruption of petroleum supplies or distribution which created an immediate threat to the public." 550 F.Supp. at 323.

**19.** A mere desire to provide guidance and information, or to clarify regulations, however, does

not suffice for good cause. *Mobil v. DOE, supra,* 610 F.2d at 803. To the extent that the FEA justified the need for regulations on the basis of "clarifying ambiguities" alone, it would not amount to good cause. However, we understand the principal justification to be the harm attendant upon announcement of the proposed rule itself: refiners "taking advantage" of the situation. Moreover, FEA sought to do more than simply clarify ambiguities: "It sought to remedy shortcoming in its regulations which had become serious only as a result of sudden changes in market conditions." *Shimek v. DOE,* 685 F.2d 1372, 1375 (TECA 1981).

both district courts here appeared to find that, as a matter of law, this is the only sort of exigency that would justify by-passing the notice and comment procedure. On a number of occasions, however, this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare. *See Nader v. Sawhill, supra,* 514 F.2d at 1068; *DeRieux v. Five Smiths, Inc.,* 499 F.2d 1321, 1332 (TECA), *cert. denied,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *see also Reeves v. Simon, supra,* 507 F.2d at 458–59.

We recognize that agencies might frequently assert that someone will take advantage of the situation if advance notice is given. If the exception is not to become an all purpose escape-clause, therefore, the anticipated response must involve a significant threat of serious damage to important public interests. The circumstances in the present case perhaps were less "calamitous," *see Nader v. Sawhill, supra,* 514 F.2d at 1068, than where announcement of a future price increase would exacerbate existing oil supply shortages, *see id.,* or announcement of a future price freeze would generate a "massive rush to raise prices." *DeRieux v. Five Smiths, supra,* 499 F.2d at 1332. Nevertheless, in view of the emergency conditions prompting the petroleum price legislation, *see Pasco v. FEA,* 525 F.2d 1391, 1394 (TECA 1975), and assuming that announcement of the deemed recovery rule would cause price discrimination and other market dislocations and dampen competition, we find that the threat to the public would be sufficiently dire for good cause to be found.

The question thus becomes whether, as a matter of fact, FEA's finding of good cause is supported by the administrative record. It appears that the district courts were skeptical, and appellees here urge that there is no showing that in fact independents would be injured during the notice and comment period. In considering this question it is essential to recognize that we are being called upon, some eight years

after the fact, to review agency determinations that were, in large measure, of a judgmental or predictive nature. Whether, in the economic circumstances of late summer 1974, independents and geographic regions were particularly vulnerable to price discrimination and, more importantly, whether refiners were likely to engage in discriminatory pricing if informed of the impending rule change, are not strictly factual questions; they involve subjective judgments.

Judgments of a predictive nature "necessarily involve deductions based on expert knowledge of the Agency"; complete factual support in the record "is not possible or required." *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978); *accord NAACP v. FCC,* 682 F.2d 993, 1001 (D.C.Cir.1982); *NRDC v. SEC, supra,* 606 F.2d at 1052; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co., supra,* 103 S.Ct. at 2871–72. Since forecasts are not susceptible of strict factual proof, they are, in the context of substantive agency decision making, entitled to special deference. The court must simply satisfy itself that the agency explains the facts and policy concerns it relies on and that, given these, a reasonable person could have made the judgment the agency did. *See NAACP v. FCC, supra,* 682 F.2d at 1001; *NRDC v. SEC, supra,* 606 F.2d at 1052. Admittedly, as our discussion in part II suggests, this extreme deference might be inappropriate in reviewing compliance with procedural requirements. Nevertheless, our examination of FEA's proffered good cause rationale must reflect the predictive element in the agency's determination and the agency's special expertise over such questions. *See generally* K. Davis, *Administrative Law Treatise* § 29.00–1 (Supp.1982).

Although September 1974 was a period of increasing oil supply, it was still a volatile time, not that far removed from the Arab oil embargo of fall 1973, and far distant from the relative stability in the oil market of 1979 or 1983. Given the changed market conditions in late summer 1974, the rela-

tively recent awareness that this was encouraging selective cost banking, and the policy of preserving the class of purchaser scheme, we are unable to say that the FEA's judgment that notice would lead to price discrimination and pressure on independents and regions was unreasonable. It is easy, in retrospect, to state that FEA's fears were exaggerated. FEA, however, was in a better position in August 1974 to appreciate the economic dynamics of the oil industry at that time than the courts are today; we must avoid being hampered by 20/20 hindsight. Certainly, just as "the announcement of a price increase at a future date *could* have resulted in producers withholding .crude oil from the market," *Nader v. Sawhill, supra,* 514 F.2d at 1068 (emphasis added), and advance notice of a price freeze led to a "massive rush to raise prices," *DeRieux v. Five Smiths, supra,* 499 F.2d at 1332, announcement of the deemed recovery rule could have generated selective pricing and "grandfathering" of unequal prices in favor of refiner-operated stations. We are not in a position to second-guess this judgment, or the determination that this would have contributed significantly to eroding the class of purchaser scheme and undermining competitive forces.

Moreover, no one claimed otherwise in September of 1974. None of the oil companies, who were not reluctant to challenge regulations, rejected the FEA's good cause argument by attacking the procedural validity of the deemed recovery rule in 1974 or 1975. This gives some credence to the FEA's predictive judgment and finding of good cause. So, too, do the numerous comments independents submitted to the FEA in response to the FEA's concern that independents and regions were susceptible to discriminatory pricing.[20] For these reasons, we conclude that the record supports FEA's good cause finding.

Appellees also argue that the September 5 preamble did not adequately recite the reasons for FEA's finding of good cause.[21] In particular, they contend that the FEA's supposed concern with price discrimination and solicitude for independents and geographic regions is simply a post-hoc rationalization advanced by appellants in these actions. We disagree.

In the September 5 preamble, the FEA indicated that some sellers were "selectively bank[ing] increased product costs as to certain classes of purchaser," while charging others the "maximum lawful price," 39 Fed. Reg. 32306, 32307 (Sept. 5, 1974), that the "improved supply situation" provided an "incentive" for sellers to engage in such practices, *id.,* and that announcement of the proposed amendment would prompt sellers "to take advantage of the situation." *Id.* We find this a sufficiently clear expression of concern with price discrimination. The September 5 preamble, it is true, did not specifically mention independents and regions of the country. The preamble, however, stated that a notice of hearings on proposed revisions of the Regulations would appear "in the near future," *id.,* which turned out to be September 10, 1974. The September 10 notice did explicitly indicate that the deemed recovery rule served to protect independents, and regions, from selective pricing. See 39 Fed.Reg. 32718,

---

20. These comments include those by: Independent Gasoline Marketers Council, app. at 01007; Independent Terminal Operators Association, app. at 01012; Powerine Oil Co., app. at 00322; Independent Fuel Terminal Operators Association, app. at 00811; Oil Heat Institute of Westchester, app. at 00800; New England Fuel Institute, app. at 00837.

21. Appellees other arguments need be addressed only briefly. The harm that could have resulted from discriminatory pricing was clearly to the general public and not simply, as appellees maintain, to one segment of the petroleum industry.

The contention that FEA could have solved the problem by publishing a notice of proposed rulemaking that indicated that the rule would be effective as of the date of the notice proves too much since it would swallow the good cause exception as we have interpreted it in *Nader v. Sawhill, supra,* and *DeRieux v. Five Smiths, supra.* Moreover, the suggestion that we impose a new procedural requirement is contrary to *Vermont Yankee Nuclear Power Co. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

32722–23 (Sept. 10, 1974). The September 10 notice was a contemporaneous statement of the agency's views, and not within the "made for litigation" rationalization proscribed by *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).[22]

For the foregoing reasons we conclude that the FEA was justified in using emergency rulemaking procedures to promulgate the deemed recovery rule under the APA, and under § 7(i)(1)(B) of the FEAA, 15 U.S.C. § 766(i)(1)(B), as well. *See Shimek v. DOE,* 685 F.2d 1372, 1374–76 (TECA 1981); *Dorchester Gas Producing Co. v. DOE,* Civil No. CA–3–75–0836, slip op. at 18 (N.D.Tex. June 24, 1983). Accordingly, we hold that the deemed recovery rule was validly promulgated on September 5, 1974. The decisions of the district courts on this issue were erroneous.

### B. *December 5, 1974 Rulemaking*

Even had the September 5, 1974 promulgation been procedurally defective, the infirmity would have been cured by the rulemaking commencing on September 10, 1974 and concluding on December 5, 1974. Both district courts held that the deemed recovery rule was not validly repromulgated, the *Mobil* court finding that the September 10 notice was inadequate and the *Naph-Sol* court holding that the December 5 publication did not contain an adequate statement of "basis and purpose" with respect to the deemed recovery rule. We disagree.

### 1. *Adequacy of the September 10, 1974 Notice*

The APA requires that notice of a proposed rule be published in the *Federal Register* and include "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and that interested persons be given an opportunity to comment on the rule. *Id.* § 553(c). The stricter FEAA required that notice "shall be given by publication of [the] proposed rule" in the *Federal Register* and that a "minimum of ten days following such publication shall be provided for opportunity for comment." 15 U.S.C. § 766(i)(1)(B).

■ Notice and the opportunity to comment serve to educate the agency, provide fair treatment to persons affected by the rule, and assist judicial review. *See Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983); *Standard Oil Co. v. DOE, supra,* 596 F.2d at 1057–58; *Shell Oil Co. v. FEA,* 574 F.2d 512, 516 (TECA 1978). Notice is sufficient if it " 'fairly apprise[s] the interested parties' of the subjects and issues before the Agency," *American Iron and Steel Institute v. EPA,* 568 F.2d 284, 291 (3d Cir.1977); *accord McCulloch Gas Processing Co. v. DOE, supra,* 650 F.2d at 1221, and thereby "affords interested persons a reasonable and meaningful opportunity to participate in the rulemaking process." *Id.; accord Atlantic Richfield Co. v. DOE,* 655 F.2d 1118, 1126 n. 6 (TECA 1981).

In this instance, the basic question is whether the September 10 notice revealed FEA's willingness to reevaluate the deemed recovery rule[23] or, rather, that the agency's mind was closed. *See id.* at 1127 n. 7; *Texaco Inc. v. FEA, supra,* 531 F.2d at 1078–79; *State of South Carolina ex rel. Patrick v. Block,* 558 F.Supp. 1004, 1020 (D.S.C.1983).

■ The September 10 notice proposed the elimination of the equal application requirements with two exceptions: 1) within a given geographic marketing area the costs passed through to a class of purchaser

---

**22.** Moreover, even if the good cause statement were inadequate, we would be disinclined to invalidate the rule when we had found that, in fact, good cause existed, *see Texaco Inc. v. FEA,* 531 F.2d 1071, 1082 (TECA), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *DeRieux, supra,* 499 F.2d at 1333, all the more so since the rulemaking here in issue preceded this court's admonition that "re-peated technical noncompliance [with the APA] will not be tolerated." *Nader v. Sawhill, supra,* 514 F.2d at 1069.

**23.** We use this term as a shorthand to refer to the requirements that costs be applied equally in actual selling prices and that a deemed recovery penalty obtain when they are not.

including independents could not be greater than those passed through to classes of purchaser not including independents; and 2) the unequal pass through of costs as between marketing areas could not exceed 10%. 39 Fed.Reg. 32718, 32727 (Sept. 10, 1974) (proposed 10 C.F.R. § 212.83(c)(1)(iii)). The "cost bank" rule proposed on September 10 deleted the deemed recovery penalty as it had appeared in the September 5 promulgation. *See* 39 Fed.Reg. at 32729 (proposed 10 C.F.R. § 212.83(1)(d)).

The September 10 preamble expressly reserved judgment on placing restrictions on the unequal pass through of costs as between regions:

> Comments are specifically requested on *whether this limitation on proposed regional flexibility in pricing is needed* and, if so, whether the proposed 10 percent limitation is appropriate.

*Id.* at 32723 (emphasis added). The preamble also stated that "to the extent that the current [equal application] requirement serves to protect the independent sector of the market, FEA has concluded that it must be retained." *Id.*

This last statement reveals that the FEA indeed was committed to protecting independents. Nevertheless, in view of the September 5 preamble's promising an opportunity to comment on the deemed recovery rule; the deletion of the deemed recovery penalty in its September 5 form from the September 10 proposed rule; the elimination of other equal application requirements; and the solicitation of comments on the limitation on unequal pass throughs among regions, we do not find that the September 10 notice, taken as a whole, establishes that the agency was unprepared to reevaluate the deemed recovery rule.

Moreover, the reaction to the notice shows that interested parties were alerted that the deemed recovery rule was under review. Many of the comments from the large refiners urged repeal of the deemed recovery rule and all equal application requirements, while others proposed extensive revisions.[24] Independents, on the other hand, supported retention of the existing rules.[25] Our reading of these comments convinces us that interested parties did not believe that the FEA's mind was closed on the question of retention of the equal application/deemed recovery rule.

One other factor persuades us that the notice was sufficient to apprise interested parties that the deemed recovery rule was before the agency. Unlike as in the typical "inadequate notice" situation, the refiners, who presumably opposed the newly promulgated cost bank amendment, here had every incentive to read the September 10 notice of proposed rulemaking expansively, and to take it as an opportunity to comment on deemed recovery rule and to urge its repeal.

For these reasons, we find the notice was adequate under the APA and the FEAA.[26]

2. *December 5, 1974 Publication: Statement of Basis and Purpose*

▇ Effective December 1, 1974, the deemed recovery rule was readopted in its September 5, 1974 form as section 212.83(e) of the Petroleum Price Regulations, 10 C.F.R. pt. 212 (1975); 39 Fed.Reg. 42368 (Dec. 5, 1974). The district court in *Naph-Sol v. Murphy* held that this December 5, 1974 repromulgation was invalid since it did not include an adequate statement of the "basis and purpose"[27] for retaining the deemed recovery rule. 550 F.Supp. at 310.

The purpose of a contemporaneous "basis and purpose" statement is to facilitate

---

**24.** The commentators included: Mobil Oil Corp., app. at 00227; Marathon Oil Co., app. at 00295; Murphy Oil Corp., app. at 00113; Union Oil Co. of California, app. at 00345; Gulf Oil Corp., app. at 00645; Texaco, Inc., app. at 00888; American Petroleum Refiners Assoc., app. at 01021.

**25.** *See* note 20 *supra*.

**26.** The FEA published notice of the exact terms of the proposed rules in satisfaction of 15 U.S.C. § 766(i)(1)(B)'s requirements.

**27.** The APA requires that "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

meaningful judicial review by enabling the court to become aware of the legal and factual background of the agency's action. *Action on Smoking & Health v. CAB,* 699 F.2d 1209, 1215–16 (D.C.Cir.1983); *State of Missouri ex rel. Freeman v. Block,* 690 F.2d 139, 143 (8th Cir.1982); *Baltimore & Ohio Chicago Terminal RR Co. v. United States,* 583 F.2d 678, 687 (3d Cir.), *cert. denied,* 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1978). Although an exhaustive listing of findings or a full analysis is not required, it is desirable for the agency to respond in a reasoned manner to the comments received and to explain how the decision was arrived at. *See Action on Smoking v. CAB, supra,* 699 F.2d at 1216. The statement of basis and purpose need not be published at the exact same moment as the rule. The inquiry must be whether "the rules and statement are published close enough together in time so that there is no doubt that the statement accompanies rather than rationalizes the rule." *Tabor v. Jt. Board for Enrollment of Actuaries,* 566 F.2d 705, 711 n. 14 (D.C.Cir.1977); *accord Baltimore & Ohio v. United States, supra,* 583 F.2d at 688.

In the December 5, 1974 preamble, the FEA indicated that it had decided to revise the price regulations on the pass through of *non*-product cost increases by refiners. The preamble continued:

Action on all other revisions to the price regulations proposed in the September 10 notice is deferred until a later date. However, those possible revisions which have not been acted on continue to be under active consideration by FEA for decision in this proceeding.

39 Fed.Reg. at 42638.

■ Admittedly, this is hardly a model statement of the reasons for the agency's decision to retain the deemed recovery rule. Nevertheless, even when the basis and purpose statement is cursory, or, indeed, non-existent, a rule may be upheld when the agency's path may reasonably be discerned. *Alabama Ass'n of Insurance Agents v. Board of Governors of the Federal Reserve System,* 533 F.2d 224, 237 (5th Cir.1976),

*cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *Hoving Corp. v. FTC,* 290 F.2d 803, 807 (2d Cir.1961); *United States v. Exxon Corp.,* 561 F.Supp. 816, 828 (D.D.C.1983); *see also DeRieux v. Five Smiths, supra,* 499 F.2d at 1333. Such is the case here.

The September 5, 1974 preamble promised the opportunity to comment on the newly promulgated deemed recovery rule. 39 Fed.Reg. at 32307. The September 10 preamble canvassed in some detail the opposing policy considerations involved, principally the interest in permitting refiners flexibility in pricing to respond to market conditions as against the concern that regions and independents not suffer unfairly from "selective" flexibility. 39 Fed.Reg. at 32722–23. The comments the FEA received elaborated these competing positions. Despite the abbreviated statement of basis and purpose, then, FEA's reason for retaining the deemed recovery rule is reasonably clear: the agency concluded that the needs of regions and independents outweighed the benefits of price flexibility.

It should be apparent that the sort of truncated basis and purpose statement contained in the December 5 preamble is not recommended: an agency should respond meaningfully to comments and explain its decision. In this case, however, we are disinclined, some eight years after the event, to invalidate a rule on the technical ground of a deficient statement of basis and purpose when we can fairly discern the agency's aims.

Accordingly, we find that the December 5, 1974 promulgation was procedurally valid. The deemed recovery rule, therefore, was validly repromulgated as of December 1, 1974.

In sum, we hold that the deemed recovery rule was validly promulgated on September 5, 1974 and validly repromulgated on December 5, 1974. The decisions of the district courts on this question are reversed. Since the *Mobil* court's ruling that the May 1977 three cent rule was procedurally invalid was premised on the invalidity of the 1974 deemed recovery rule, that ruling is

vacated. The case is therefore remanded for consideration of the impact of the September 1974 deemed recovery rule on the April 1974 three cent rule, directed toward determining whether the May 1977 three cent rule was validly promulgated as an interpretive rule.

That portion of *Naph-Sol v. Murphy* ruling that Naph-Sol was not entitled to recovery for overcharges due to Murphy's violation of the deemed recovery rule is vacated. The case is remanded for determination of whether, in fact, Murphy violated this rule and overcharged Naph-Sol thereby. Unlike our review of *Mobil v. DOE,* our review of *Naph-Sol v. Murphy* is not yet complete. We must consider the claim that Murphy's May 15, 1973 selling price was in violation of the contract between the parties and, therefore, of the Price Regulations.

### V. *Price Overcharge: May 15, 1973 Transaction Price*

#### A. *Jurisdiction*

Initially, Murphy raises the question of our jurisdiction over Naph-Sol's appeal from the district court's determination that the prices Murphy charged Naph-Sol on May 15, 1983 were permissible under the parties' supply contracts and, therefore, lawful under the Price Regulations.[28]

■ Section 211(b)(2) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, granted the Temporary Emergency Court of Appeals "exclusive jurisdiction over all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder." Section 5 of the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(1), incorporated this special grant of jurisdiction. Two principal inquiries guide our determination of TECA jurisdiction: whether resolution of the litigation in its entirety requires the application or interpretation of the EPAA and regulations, *Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corp.,* 591 F.2d 711, 716 (TECA), *cert. denied,* 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979), and whether an EPAA issue has been adjudicated in the district court. *Texaco Inc. v. DOE,* 616 F.2d 1193, 1198 (TECA 1979); *Coastal States Marketing Inc. v. New England Petroleum Corp.,* 604 F.2d 179, 187 (2d Cir. 1979); *see Francis Oil & Gas Inc. v. Exxon Corp.,* 687 F.2d 484, 487 (TECA 1982).

■ Naph-Sol seeks recovery for overcharges pursuant to § 210(b) of the ESA, 12 U.S.C. § 1904 note. Thus allegations in the complaint implicate the EPAA and its implementing regulations. Indeed, the claim rests entirely on the Regulations and its resolution involves their application. The interpretation of the terms of the supply contracts between Naph-Sol and Murphy was incident to, and interwoven with, the question whether Murphy's May 15, 1973 selling price was lawful under the Regulations. Although based on its interpretation of the contract, the district court was required to resolve the litigation and held that Murphy had not violated the Price Regulations; therefore, an EPAA issue has been adjudicated and we have jurisdiction over this appeal. *See Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corp., supra,* 591 F.2d at 716; *Mountain Fuel Supply Co. v. R. Johnson & Johnson Oil Co.,* 586 F.2d 1375, 1384 (10th Cir.1978).

#### B. *Merits*

■ The contract prices in each of the two supply agreements between Naph-Sol and Murphy[29] were set by reference to, and fluctuated with, "Platt's Chicago Post-

---

**28.** Under the Regulations, a refiner's base price was "the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973 plus increased product costs . . ." 10 C.F.R. § 212.82(b)(1) (1975). The maximum allowable price was base price plus allowable nonproduct cost increases. Naph-Sol alleges that it constituted a separate and individual single member class of purchaser.

**29.** The first contract governed purchases by Naph-Sol at Murphy's terminal at Ferrysburg, Michigan; the second governed purchases at Murphy's terminal at Marquette, Wisconsin.

ings," [30] but were "subject to . . . minimum and maximum prices" for each product. Stip. Record on Appeal at 89–94. Under the contracts, Naph-Sol was required to purchase a minimum of 7.5 million gallons of motor gasoline at Ferrysburg and 1 million gallons of gasoline at Marquette. The supply agreement also included a "price adjustment" clause, which read as follows:

Price Adjustment. MURPHY reserves the right at any time during the period of this agreement to increase or decrease the agreement price provided for herein. In the event any such increase or decrease in price is unacceptable to Purchaser, Purchaser shall have the right to cancel the agreement on written notice insofar as the particular product or products involved are concerned, said cancellation to be effective at the time stated in said notice. On the failure of Purchaser to exercise this right of cancellation, the increase or decrease in prices shall become automatically effective.

Id. at 91.

On or shortly before May 15, 1973, Murphy began to charge prices in excess of the maximum stated in the supply agreements.[31] Naph-Sol accepted fuel shipments and paid these higher prices. Naph-Sol, which purchased petroleum from Murphy at least through the filing of its complaint in 1979, alleges that the prices charged by Murphy violated the supply contracts and, therefore, the Price Regulations. Murphy, relying on the price adjustment provision, maintains the prices were valid under the contracts.

The district court granted summary judgment in favor of Murphy. The court found that the contract terms were unambiguous and that the price adjustment provision permitted Murphy to charge Naph-Sol prices in excess of the maximum in the supply agreements. Since Naph-Sol accepted fuel shipments at these prices, under the price adjustment clause the prices automatically became effective. The court rejected Naph-Sol's argument that the price adjustment term was inconsistent with the minimum-maximum provision and that the specific term (the minimum-maximum term) governed over the general term. Under the agreements Naph-Sol was obligated to purchase minimum amounts of gasoline when prices were within the minimum and maximum range. Naph-Sol, however, could be excused from meeting its minimum purchase requirements if Murphy increased its prices in accordance with the price adjustment clause. The two provisions, the court reasoned, are therefore not inconsistent. Naph-Sol v. Murphy Oil, supra, 550 F.Supp. at 306.

We agree with the district court's construction. The contract terms are unambiguous. In particular, by its plain language the price adjustment clause authorized Murphy to increase its prices beyond those expressly provided for in the contracts.[32] Contrary to Naph-Sol's argument, advanced in the district court and renewed on appeal, this provision may reasonably be harmonized with the minimum-maximum clause, as the district court has shown, such that effect many be given to all the terms in the contract.[33]

---

**30.** Platt's Chicago Posting is an average of refiners' posted prices at Chicago, Illinois, for a particular refined product, as published in *Platt's Oilgram,* a daily industry newsletter.

In the Ferrysburg contract, Naph-Sol agreed to pay Murphy a price equal to Platt's Chicago Posting minus $.0025 per gallon, and in the Marquette contract, Platt's Chicago Posting plus $.0025 per gallon.

**31.** These prices were based on Murphy's prevailing terminal wholesale postings ("rack prices").

**32.** Naph-Sol's argument that the price adjustment clause meant that Murphy could arbitrar-

ily choose to vary prices within the minimum-maximum range ignores the plain language stating that Murphy could, at any time, "increase or decrease the agreement price provided herein." The agreement price can only be understood as the Platt's Chicago Posting price up to the maximum. Moreover, under Naph-Sol's interpretation, it would have had the right to cancel the contract even when the price Murphy charged was within the contract ceiling. This interpretation is not plausible.

**33.** Naph-Sol urges that it would be "ridiculous" for it to have entered a contract that gave Murphy the power unilaterally to raise prices

Accordingly, we hold that Murphy's May 15, 1973 selling price was permissible under the parties' supply agreements and, therefore, that Murphy used a lawful May 15, 1973 transaction price under the price regulations.

## VI. *Conclusion*

In conclusion, we rule as follows. In *Mobil v. DOE* we hold that: 1) the April 1974 three cent rule did not itself require equal application of the three cent cost allowance; 2) the promulgation of the deemed recovery rule on September 5, 1974 was procedurally valid; and 3) the repromulgation of the deemed recovery rule on December 5, 1974 was procedurally valid. The district court's judgment that the May 5, 1977 three cent rule was procedurally invalid is vacated. The case is remanded for consideration of the impact of the deemed recovery rule on the April 1974 three cent rule and, in this light, of the procedural validity of the May 1977 three cent rule.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

In *Naph-Sol v. Murphy Oil* we hold that: 1) Murphy's May 15, 1973 selling price was permissible under the parties' supply contracts and lawful under the price regulations; 2) the promulgation of the deemed recovery rule on September 5, 1974 was procedurally valid; and 3) the repromulgation of the deemed recovery rule on December 5, 1974 was procedurally valid. The case is remanded for determination of whether, in fact, Murphy violated the deemed recovery rule and thereby overcharged Naph-Sol.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

with Naph-Sol's only recourse being to terminate the contract. This being as it may, when the contract is unambiguous, the courts may not write a party a better agreement than it entered.

Naph-Sol frequently refers to the price adjustment clause as mere "boilerplate" in a "form contract" prepared by Murphy as though, somehow, the term therefore did not count. Naph-Sol, however, does not allege that this was a contract of adhesion and, given the status of the parties, there is no suspicion that it was. Further, the contract was only three pages in length, typed, and easily readable. Moreover, on the first page, ¶ 4 specifically stated that "The Provisions of Agreement stated below, except those that by their terms are inapplicable, are part of this agreement." Stip. Record on Appeal 89. The price adjustment clause was found under the "Provisions of Agreement."